WALLACE v. DRIVER.

Opinion delivered January 4, 1896.

RIPARIAN RIGHTS—ACCRETION AND AVULSION.—Where land of a riparian owner on a navigable stream is washed away, such owner is not entitled to recover land formed many years afterward within his original boundaries, unless the washing away was sudden and perceptible, and the limits of the change of channel or banks can be determined, or the newly formed land was made by accretions beginning at the high water mark of such owner's remaining land.

Appeal from Mississippi Circuit Court.

JAMES E. RIDDICK, Judge.

This was an action in ejectment, brought by the appellee, James D. Driver, against the appellant, D. W. Wallace, for recovery of a portion of the lands situated in a fractional quarter section of land lying along the banks of the Mississippi river. The answer set up a general denial; also the special plea that the land held by defendant was the property of the State of Arkansas, by reason of having been formed in the bed of the Mississippi river.

The agreed statement of facts is as follows: "The NW. fr. ¼ section 30, in T. 13 N. and R. 11 E., Mississippi county, state of Arkansas, was entered from the U. S. government by Harrison Phillips, in November, 1848, and contained, at that time, one hundred and fifty-four (154) acres; which land was afterwards conveyed by Phillips to the plaintiff, Driver, and James H. Edrington; and the said Edrington conveyed his undivided interest to the said Driver, who now claims to be the sole owner of said NW. fr. ¼ section. Subsequently to the entry of said land from the government, a large portion thereof caved into the Mississippi river,

and where said caving took place became a portion of the bed of the river, and so remained for some twenty-five years before said island formed in the bed of said river. After this an island was formed out in front of the main shore, and of the residue of the quarter section not washed away, within the metes and bounds of said quarter section as originally entered from the government, and in the place where was a portion of said quarter section before the same washed away. Between the island so formed and the main shore, there is a chute through which the water flows when the Mississippi river is high, but such chute, during low water, is dry, with the exception of a few water holes, and is not now a part of the bed of the river, having been filled by deposit of the river. The defendant, D. W. Wallace, is now in possession of thirty-five acres of the land made by the formation of said island within the original boundaries of said fractional quarter section, at the time of its entry from the government. The tax books show taxes to have been paid by the plaintiff on 80 acres only, in said fractional NW. ¼ section from the date of his purchase up to the year 1891."

The jury found that the defendant was in the unlawful possession of 35 acres of the land sued for, and the court rendered judgment accordingly.

*Charles P. Harnwell*, for appellant.

The title to the bed of navigable streams belongs to the state, and the riparian owner takes only to "high water mark," and not "*ad medium filum aquae.*" 53 Ark. 314, 315; 54 *id.* 517; Woolrych on Waters, 40–44; Angell on Tide Waters, 22, 24; 94 U. S. 325; 9 Conn. 40; 3 Iowa, 1, 54; 33 N. Y. 461; 3 Howard, 27, 220; 9 *id.* 471; 29 S. W. 681–2; 25 Ark. 120; 1 Am. & Eng. Enc. Law, 137; 21 S. W. 592.

*S. S. Semmes*, for appellee.

The facts in this case are different from those in 53 Ark. 314. Here the land claimed is *within* the metes and bounds of the United States survey. Where one's lands are eroded or washed away, and are made back again or uncovered, they become his property, if he can locate them. 28 S. W. 746; 86 Mo. 209; 61 How. Pr. 197.

BATTLE, J. The water boundaries of land on running streams, whatever they may be in the beginning, whether the thread of the stream, the water's edge, ordinary high or low water mark, always remain the same when they change gradually, as by the process of accretion or attrition. They gradually shift as the water recedes or encroaches; and the area of the riparian owner's possession varies as they change by this process. Whatever constituted them at first still constitutes them so long as it remains permanent or shifts gradually and imperceptibly. Hence, land formed by alluvion, or the gradual and imperceptible accretion from the water, and land gained by reliction, or the gradual and imperceptible recession of the water, belong to the owner of the contiguous land to which the addition is made. This rule has been vindicated by some one on the principle "that he who sustains the burden of losses and of repairs, imposed by the contiguity of water, ought to receive whatever benefits they may bring by accretion. By others it is derived from the principle of public policy that it is the interest of the community that all land should have an owner, and most convenient that insensible additions to the shore should follow the title to the shore itself." *New Orleans* v. *United States*, 10 Pet. 662, 717; *Jefferis* v. *East Omaha Land Co.* 134 U. S. 178; *Nebraska* v.

*Iowa*, 143 U. S. 359; Gould on Waters, sec. 155; 2 Blackstone, 262.

In order to constitute an accretion, it is not necessary that the formation be indiscernible by comparison at two distinct points of time. It is true that it is an addition to riparian land, "gradually and imperceptibly made by the water to which the land is contiguous;" but the true test "as to what is gradual and imperceptible in the sense of the rule is that, though the witnesses may see from time to time that progress has been made, they could not perceive it while the process was going on." *Rex* v. *Lord Yarborough*, 3 B. & C. 91, is a good illustration. In that case the court held that 450 acres of land formed by the gradual deposit of ooze, sand and soil from the sea belonged to the owner of the adjoining land as an accretion. Other cases to the same effect may be cited. *Jefferis* v. *East Omaha Land Co.*, 134 U. S. 178.

What has been said of accretions is equally true of the loss suffered from the gradual encroachments of running streams. As their beds change imperceptibly by the gradual washing away of the banks, the boundary lines of contiguous lands change with them; and the owner, having, in the beginning, acquired no fixed freehold in them, but one that shifted with the changes, is limited and confined, in the extent of his rights and possession, by the new boundaries. *St. Louis* v. *Rutz*, 138 U. S. 226, 245; *Camden & Atlantic Land Co.* v. *Lippincott*, 45 N. J. L. 405; *Welles* v. *Bailey*, 55 Conn. 202; *Steele* v. *Sanchez*, 72 Iowa, 65; *Niehaus* v. *Shepherd*, 26 Ohio St. 40; *Wilson* v. *Shiveley*, 11 Oregon, 215; *Dunlap* v. *Stetson*, 4 Mason, 349; *In re Hull & Selby Ry.* 5 M. & W. 327; *Scratton* v. *Brown*, 4 B. & C. 485, 10 E. C. L. 670; *Foster* v. *Wright*, L. R. 4 C. P. D. 438; Gould on Waters (2 ed.) sec. 155.

In *Welles* v. *Bailey*, 55 Conn. 292, in speaking of rights acquired by changes gradually made by rivers, it is said: "If a particular tract was entirely cut off from a river by an intervening tract, and that intervening tract should be *gradually* washed away until the remoter tract was reached by the river, the latter tract would become riparian as much as if it had been originally such. This follows necessarily from the ordinary application of the principle. All original lines submerged by the river have ceased to exist; the river is itself a natural boundary, and every changing condition of the river in relation to adjoining lands is treated as a natural relation, and is not affected in any manner by the relation of the river and the land at any former period. If, after washing away the intervening lot, it should encroach upon the remoter lot, and should then begin to change its movements in the other direction, *gradually* restoring what it had taken from the remoter lot, and finally all that it had taken from the intervening lot, the whole, by the law of accretion, would belong to the remoter but now proximate lot. Having become riparian, it has all riparian rights. This general principle is recognized by all the text writers, and by numerous decisions of the English and American courts. The river boundary is treated in all cases as a natural boundary, and the rights of the parties as changing with the change of its bed."

In *Foster* v. *Wright*, L. R. 4 C. P. Div. 438, "the plaintiff was lord of a manor held under grants giving him the rights of fishery in all the waters of the manor, and, consequently, in a river (Lune) running through it. Some manor land on one side, and near, but not adjoining, the river, was enfranchised, and became the property of the defendant. The river, which then ran wholly within lands belonging to the plaintiff, afterwards wore away

its bank, and by gradual progress, not visible, but periodically ascertained during twelve years, approached and eventually encroached upon the defendant's land, until a strip of it became part of the river bed. The extent of the encroachment could be defined. The defendant went upon the strip and fished there." The court held "that an action of trespass against him for so doing could be maintained by the plaintiff, who had the exclusive right of fishery which extended over the whole bed of the river, notwithstanding the gradual deviation of the stream on to the defendant's land." Judge Lindley said: "Supposing, therefore, that the plaintiff's right to fish in the Lune depends on his ownership of the soil of the river bed, I am of the opinion that the plaintiff has that right; for, if he was the owner of the old bed of the river, he has day by day and week by week become the owner of that which has gradually and imperceptibly become its present bed; and the title so gradually acquired cannot be defeated by proof that a portion of the bed now capable of identification was formerly land belonging to the defendant or his successor in title."

In *Cox* v. *Arnold*, 31 S. W. Rep. 592 (which was decided by the supreme court of Missouri), it appeared that "a portion of a fractional section bordering on a navigable stream was washed away by the current;" and that "an accretion formed from an island in the river, and extended within the boundaries of the section, but did not connect with the new shore line." The court held that the owner of the section had no title to any part of the accretion. Justice Burgess, in delivering the opinion of the court, said: "It is well settled in this state, by an unbroken line of decisions, that a riparian proprietor on a navigable stream only owns to the water's edge. * * * * When a riparian owner becomes the owner of land, he acquires, as incident

thereto, without price, whatever may be added to it by gradual and imperceptible accretion, while, at the same time, he assumes the risk of losing it all by its being gradually washed away by the waters of the river ; but his line always remains at the water's edge, wherever that may be. His line expands as the waters recede and accretions form to his land, and contracts as the waters encroach upon and wash away his land. The only way that plaintiff could have regained what land he had lost by its being washed away, and its *situs* submerged by the waters of the river, was by gradual and imperceptible accretion, beginning at his line, at the water's edge. In this way he would become the owner, and entitled to the possession, of all land accreted to his original tract, or that portion of it which had not been washed away. Plaintiff's line being at the water's edge, he was not entitled to recover in this action, notwithstanding the land began to re-form within the original survey of said quarter section, at a place where the land was, at the time of said survey, uncovered by water ; and it makes no difference that defendant Naylor may not be the legal owner, or that he may be in its wrongful possession."

In *St. Louis, &c. Railway Co.* v. *Ramsey*, 53 Ark. 314, it was held by this court that "a riparian owner upon a navigable stream, deriving title from the United States" -to lands in this state, "takes only to high-water mark, and not to the middle of the stream, the title to the bed of the stream being in the state;" and that this high-water mark "is to be found by ascertaining where the presence and action of water are so usual and long continued in ordinary years as to mark upon the soil of the bed a character distinct from that of the banks in respect to vegetation and the nature of the soil." According to the cases we have cited, the high-water mark, as thus defined,

being the boundary line of the riparian owner in this state, is the point at which the formation of all lands acquired by him by accretion must begin. A formation of alluvion beginning at any other point would belong to the state or other party. In that case the gradual and imperceptible addition, which is necessary to constitute an accretion, would be lacking.

The reverse of what has been said of accretions and erosions is true of avulsions. Where a stream which forms a boundary line of lands from any cause suddenly abandons its old, and seeks a new, bed, or suddenly and perceptibly washes away its banks, such change of channel or banks (if its limits can be determined) works no change of boundary. The owner still holds his title to the submerged land. If an island or dry land afterwards forms upon it, the same belongs to him. *St. Louis* v. *Rutz*, 138 U. S. 226; Gould, Waters, (2 ed.) sec. 158, 159, and cases cited.

The burden in this case was on the plaintiff to prove that he was entitled to the land in controversy. The evidence showed that it was entered in November, 1848, and contained at that time 154 acres ; and after that a large portion of it "caved" into the Mississippi river. There was no satisfactory evidence as to how large this portion was in excess of 35 acres, or any evidence as to how long it was in caving, or whether it caved gradually and imperceptibly, or *vice versa*, or that the land in controversy was added to his own by accretion, beginning at his line, at high-water mark. He failed to sustain his claim.

The instructions given to the jury were fatally defective. It is unnecessary to point out the defects, as we have already said what the law governing the case is.

Reversed and remanded.

Riddick, J., disqualified.

BUNN, C. J. (dissenting).   I do not deem it neces-
sary to reiterate the familiar rules of the common law
governing the rights of riparian owners, and the pre-
rogatives of the crown and sovereign power, as to tide-
water streams, and the lands beneath and bordering
thereon.  The great difficulty with Americans has always
been, not to understand these rules, as applied to the
condition of things existing in England, but rather to
make them applicable in any reasonable sense, under
the circumstances which surround us, especially in the
newer or western and southwestern states of the Union.
Our system of surveying, admeasurement and convey-
ance of lands, the great magnitude of our lakes and
rivers, and our dual form of government, all conspire
together to create difficulties in the way at every step in
our efforts to conform to the principles of the common
law.   That a riparian owner, as such, under the common
law, owns to the middle thread of the fresh-water river
on his border, and to the upper margin or high-tide
mark of the tide-water river, which forms his boundary,
and in the latter case is subjected to the results of ero-
sion, and is entitled to all gains by accretion and relic-
tion, are truisms, that all are expected to be familiar
with ; but how far we may be able to adopt these ven-
erable rules to our changed conditions, is not without
the greatest difficulty in any given case.

It is altogether probable that a case just like the
one we have under consideration could never have arisen
under the strict common-law system.   In the first place,
in England, rivers and other bodies of water were
the natural boundaries of lands, and that idea entered
into the description contained in all their conveyances.
To speak of one's land as being bounded on the north
or south, east or west, by the Thames, the English
would readily understand the nature of the landed
estate sought to be described.   If it was above tide

water, they would readily know that the owner owned to the middle thread of the stream, and his peculiar boundary was therefore as varying and as variable as the stream itself. On the other hand, if the domain lay below the point where the stream was affected by the ebb and flow of the tide, they understood readily that the riparian owner was subjected to loss by erosion, and at the same time, was entitled to whatever might be added to his land by accretion or reliction ; and this was so, not on account of the rule of the gambler's justice, where the possibility of gain was one's due for the mere risk of loss, which some have attempted to assign as a reason for the rule, nor, as others say, because public policy demands that there shall be no unappropriated public lands, but because the boundary, being the bank of the river, will be the same, in name, a hundred years hence, though that bank has moved very far laterally, the one way or the other. It will still be the bank of the river, though the owner's domain has diminished in size by erosion, a fourth or a half ; or has increased, by accretion, to the same extent. At the end of the century from the date of the grant, the sheriff, armed with his writ of ouster, would still be enabled to find the land, so far as the river front is concerned, because he finds the line of the high tide, and that is the "metes and bounds," although it has actually changed much since the original grant was made. It is still written in that same language and form in the deed.

Now, our system is imaginary parallel and perpendicular lines, forming parallelograms, and the fractions of such as occasion may make necessary. But they are fixed lines, permanently located, and a hundred years from the date of the grant will include exactly and definitely the same portion of the earth's surface, although that may then be wholly or in part in the river, whereas it was all dry land at first, and the

sheriff armed with his writ, wherein the description, as
in the other case, is in the exact language as when first
written, locates the land by it, and not by any extra-
neous evidence whatever, though he finds the lines on
the water instead of the dry land. This is the portion
of the earth's surface sold to the individual by the fed-
eral government, which, in its acts of cession to the
state, reserved to itself the title to all lands and the
absolute and unconditional right to dispose of them with
the fair understanding that its grants to the individual
must never be molested or interfered with, whatever
may be the assumed rights of the state as against all
others, even as against the federal government.

Outside the boundary lines within which the land
belongs to the individual by federal grant, the state
disposes by whatever rule or law she may choose to
make on the subject, but she cannot curtail the right of
the owner by any arbitrary rule, although it may have
the sanction of judicial accommodation of the common-
law principle to the circumstances of the case. It must
be born in mind that when the land involved, was pur-
chased from the government, the common law was in
force in all its plenitude in both federal and state gov-
ernment. Even the modified rule announced in the case
of The Gennessee Chief,[1] had not then been announced;
but the old English rule was still in force, and the pur-
chaser purchased with that rule as a part of his con-
tract. That rule regarded the riparian owners on the
Mississippi river as owning to, the middle thread, it not
being a tide-water stream. Such was the common law,
and Arkansas had adopted the common law, and has
never adopted any other rule unto this day, unless we
are to regard the court-made law of legal decisions of
recent date as a change of the rule. There is not a

---

1 *Propeller Gennessee Chief* v. *Fitzhugh,* 12 How. (U. S.) 443.

word in our statutes going to show us what the state has accepted as her interest in the bed of the Mississippi or any land or island that may form therein. This court may say that the common law rules are not applicable in our case, but that does not mean that the court can arbitrarily make other rules that will be applicable, for it is the right of property we are now dealing with.

The decision of the court in the case at bar is based mainly upon *Cox* v. *Arnold*, 31 S. W. Rep. 592, and *Naylor* v. *Cox*, 21 S. W. Rep. 589, both Missouri cases, in which the suggestion of the point I have endeavored to make was passed over by a mere repetition of the common law rule, as if the very point was not the inapplicability of the common law rule. Besides, the description there was very nearly as a common-law description of riparian lands.

In *St. Louis, &c., Railway Co.* v. *Ramsey*, 53 Ark. 314, the point was neither raised nor discussed. The sand bar or gravel bed in that case had not as yet risen high enough to be denominated land, and was held still to be the property of the state, as the bed of the river over which steam-boats plied in trade and commerce. The farcical part of that case was that Ramsey would have gained title to something he never pretended to buy, had he not been in such a hurry to bring his suit, for presumably the bar would have raised its head out of the water after awhile.

In *Cox* v. *Arnold*, *supra*, Chief Justice Brace dissented; and while he did not file a written opinion, we may conclude that his dissent was on similar grounds as his dissenting opinion in another case.

Gould, in his work on Waters, (sec. 155, p. 313,) says: "But when the line along the shore is clearly and rigidly fixed by a deed or survey, it is not so certain that it will afterwards be changed because of its accretions

[and of its erosions], although, as a general rule, the right to alluvion passed as a riparian right." Referring to *Fulton* v. *Frandolig*, 63 Tex. 330; *James* v. *Howell*, 41 Ohio St. 696, and *Buras* v. *O'Brien*, 42 La. Ann. 527, and to which may be added *Cook* v. *McClure*, 58 N. Y. 437; *Minton* v. *Steele*, 28 S. W. Rep. (Mo.), 748; *Butler* v. *Grand Rapids & I. R. Co.* 48 N. W. Rep. (Mich.), 571, and authorities there cited.

In the New York case cited, the court said: "In an action of ejectment plaintiff claimed under a deed conveying the premises upon which was a mill and pond. The boundary line along the pond commenced 'at a stake near high-water mark of the pond, running thence along the high-water mark of said pond to the upper end of said pond.'" *Held*, that the line thus given was a fixed and permanent one, and did not follow the changes in high-water mark of the pond; and that defendant, who owned the bank bounded by said line, could not claim any accretions or land left dry in consequence of the water of the pond receding, although the gradual and imperceptible result of natural causes. It seems that this pond was a river dammed up, and that to such ponds the courts in New York apply the common law rules. In *Mulry* v. *Norton*, 100 N. Y. 424, the court said: "No lapse of time during which the submergence has continued bars the right of the owner to enter upon the land reclaimed and assert his proprietorship when the identity can be established by reasonable marks, or by situation, extent of quantity and boundary on the firm land." And further: "And so, if an island forms upon the land submerged [as in this case], it belongs to the original owner. The sovereign [the state] succeeds to the ownership of such islands and formations only as are originally created and located in tideways outside of the boundaries of property which has been the subject of individual ownership."

In the Missouri cases, the island was not within the metes and bounds of the riparian owner, but belonged to another. In a contest between this islander and the main shore owner, the court held that the accretions were to the former land. I think the court was probably correct in that, only the islander's right should have stopped at the nearest boundary of the shore owner; otherwise, his grant from the federal government would be interfered with, which cannot be. In the case at bar the island rose up within plaintiff's boundary, and the only possible claimant is the state, and she makes no claim. In this state of things, I think the plaintiff has title superior to all others, if not superior to the state, who holds, if at all, not as an individual, but as a sovereign. The judgment in my opinion should be affirmed.