## HANCOCK v. MOORE.
### No. 3878.

Court of Civil Appeals of Texas. El Paso.
Oct. 12, 1939.

Rehearing Denied Nov. 2, 1939.

Moore & Moore, of Paris (W. F. Moore, of Austin, of counsel), for appellant.

Long & Wortham and E. L. Myers, all of Paris, for appellee.

PRICE, Chief Justice.

This is an action in trespass to try title originating in the District Court of Lamar County, Texas. The trial was before the court and judgment was in favor of the defendant, hereinafter called defendant, from which appellant, hereinafter called plaintiff, duly perfected her appeal.

The trial court made up and filed, on the request of plaintiff, findings of fact and conclusions of law, which are as follows:

"1. I find that on the 10th of March, 1870, Elizabeth Arthur was the owner in

fee simple of 327 acres of land, more or less, in the Bennett T. Logan survey in Lamar County, Texas.

"The south boundary line of said 327 acre tract of land was the north boundary line of a 500 acre tract of land in the Bennett T. Logan Survey, conveyed to John R. Craddock and W. T. F. Coles by virtue of an execution sale against Bennett T. Logan, January 10, 1845.

"The patent to the Bennett T. Logan Survey was issued October 22, 1845, at which time its north boundary line followed the meanderings of Red River as Red River was then situated.

"2. I find that on March 19, 1870, Elizabeth Arthur, by special warranty deed, conveyed to Nannie S. Hancock an undivided one-half interest in the 327 acres of land owned by her in the said Bennett T. Logan Survey, and mentioned in the preceding paragraph hereof.

"The said 327 acre tract of land was located on the north end of the said Bennett T. Logan Survey and its north boundary line was the north boundary line of the said Bennett T. Logan Survey, and the south boundary line was the north boundary line of the Craddock-Coles 500 acre tract above referred to.

"3. I find that on February 5, 1880, said Nannie Hancock, joined by her husband, G. W. Hancock, by general warranty deed conveyed to Jeff Hancock 125½ acres, more or less, out of the 327 acres of land theretofore owned in common by Nannie Hancock and Elizabeth Arthur. This 125½ acres so conveyed was the land allotted to Nannie Hancock by a prior partition of the said 327 acres of land formerly owned in common by Elizabeth Arthur and Nannie Hancock.

"On the date of the deed from Nannie Hancock and husband to Jeff Hancock, the Elizabeth Arthur-Nannie Hancock 327 acre tract of land was then bounded on the north and also partially on the west, by Red River as said river was then situated on the ground.

"4. The beginning point of the description of the said 125½ acres conveyed by Nannie Hancock and G. W. Hancock to Jeff Hancock on February 5, 1880, and above referred to, was the northwest corner of the Bennett T. Logan Survey on the bank of Red River as the river ran and was located on that date.

"5. On June 12, 1891, Jeff Hancock and wife, Hattie O. Hancock, executed a general warranty deed to Jackson Becraft to 125½ acres of land of the Bennett T. Logan Survey in Lamar County. The land was described as beginning at a stake on the bank of Red River at the northwest corner of the Bennett T. Logan Survey, and was described as follows:

" 'A part of the Bennett T. Logan Hd. Right Survey;

" 'Beginning at a stake on the bank of Red River, it being the N. W. corner of said Hd. Right Survey;

" 'Thence South with the W. B. line of the said survey 28 poles to a stake;

" 'Thence East 144 poles to a stake;

" 'Thence North 34 poles to a stake;

" 'Thence West 58 poles to a stake;

" 'Thence North 25½° East 202 poles to a stake on the bank of Red River;

" 'Thence up said Red River with its meanderings to the place of beginning, containing 125½ acres of land, more or less.'

"6. On May 9, 1892, Jackson Becraft and wife, Permelia Becraft, executed a general warranty deed to O. S. Casey to 125½ acres of land, more or less, described as follows:

" 'A part of the Bennett T. Logan Headright Survey;

" 'Beginning at a stake on the bank of Red River, it being the N. W. corner of the Hd. Right Survey;

" 'Thence South with the W. B. line of the same 28 poles to a stake;

" 'Thence East 144 poles to a stake;

" 'Thence North 34 poles to a stake;

" 'Thence West 38 poles to a stake;

" 'Thence North 23½ East 202 poles to a stake on the bank of Red River;

" 'Thence up said River with its meanderings to the place of beginning, containing 125½ acres of land, more or less.'

"7. On October 26, 1925, O. S. Casey executed a general warranty deed to C. J. Hancock to 125½ acres of land, more or less, described as follows:

" 'Part of the B. T. Logan Survey,

" 'Beginning at a stake on the bank of Red River, at its intersection with the W. B. line of the headright survey;

" 'Thence south with said W. B. line 28 poles to a stake;

" 'Thence east 144 poles, a stake;

" 'Thence north 34 poles, a stake;

" 'Thence west 58 poles, a stake;

" 'Thence north 25½° east 202 poles to a stake on the bank of Red River;

" 'Thence up said river with its meanderings to the place of beginning, containing 125½ acres of land, more or less.'

"8. From February 5, 1880 (the date of the deed from Nannie Hancock and husband, G. W. Hancock, to Jeff Hancock), to 1915, the waters of Red River at intervals washed and overflowed the south bank of said river until the land described in the deed to Jeff Hancock was taken and eroded by the gradual eating away of the south bank of Red River.

"9. In 1915, Red River, by its gradual encroachment upon the land to its south, had eroded and taken away the land on its south bank to the extent that in said year the south bank of the river in said year was south of the north boundary line of the Craddock and Coles 500 acre tract on the northwest corner thereof.

"10. By the gradual change of Red River and the encroachments thereof upon the land described in the deed from Nannie Hancock and G. W. Hancock to Jeff Hancock (of date Feb. 5, 1880), all of the land described in that deed was washed away and taken by the erosive processes of Red River as it gradually changed its course to the south.

"11. Sometime in 1915 Red River began receding to the north, and since that time has gradually receded to the northward to where it now runs a distance of a mile or more north from its place of furthest advance south in the year 1915.

"The movement of the river northward was accompanied by accretions and deposits of the river to the land bordering on its south bank, during the time from the year 1915 to date.

"The land lying between the south bank of Red River as it ran during its furthest advance southward in the year 1915, and the south bank of Red River where it now runs, is land formed by deposits and accretions by the river as it receded gradually to its present location on the ground.

"12. The beginning point of the description of the land conveyed by Nannie Hancock and G. W. Hancock to Jeff Hancock by deed dated February 5, 1880, is not capable of being definitely located on the ground by reason of the various changes of Red River since the date of said deed. And the exact location of the 125½ acres of land described in said deed cannot be definitely determined. But the south boundary line of the said 125½ acres of land conveyed by Nannie Hancock and G. W. Hancock to Jeff Hancock on February 10, 1880 is somewhere approximately one-fourth of a mile north of the north boundary line of the Craddock and Coles' 500 acre tract.

"13. C. J. Hancock is dead and the plaintiff, Mrs. Nannie Hancock, is the sole beneficiary under his will and is independent executrix of the estate of said C. J. Hancock.

"Conclusions of Law.

"From the above set out facts I conclude as a matter of law as follows:

"1. That plaintiff did not establish title to the accreted land or to any part thereof.

"2. That plaintiff did not identify the land sued for.

"3. That plaintiff did not show title to the land described in her petition.

"4. That the Court had no evidence upon which judgment could be rendered in favor of the plaintiff.

"5. That plaintiff should take nothing by reason of this suit."

Plaintiff excepted to the judgment entered and by assignment of error and proper proposition attacked the ninth paragraph of the Court's findings of fact, its tenth finding of fact, twelfth finding, and makes various attacks on the Court's conclusions of law.

Plaintiff's first amended original petition described the land as follows:

"Situated in the County of Lamar and State of Texas, to-wit:

"A part of the Bennett T. Logan Survey, beginning at a stake on the WB line of said survey at the Northwest corner of a 500 acre tract of land out of said Survey formerly belonging to John R. Craddock and W. T. F. Coles, as shown by deed to them from John W. Smith, Deputy Sheriff of Lamar County, dated October 4, 1844, and recorded in Book A, B & C, page 642, of the Deed Records of Lamar County, Texas, and which beginning point is 28 poles South of the point where the Northwest corner of the Bennett T. Logan Survey bisected the South bank of Red River as it

ran, and according to its location on the 5th day of February, 1880, and which is the date of the deed from G. W. Hancock and wife, Nannie Hancock, to Jeff Hancock, which is recorded in Book 58, Page 185 of the Deed Records of Lamar County, Texas;

"Thence East with the NB line of the said Craddock and Coles 500 acre tract 2376 feet, a stake;

"Thence North 561 feet or 35 poles to a stake;

"Thence West 957 feet or 58 poles to a stake;

"Thence North 25 East 3800 feet, a stake in the south bank of Red River;

"Thence up said river as follows: North 56 west 200 feet;, North 70 West 800 feet; North 72 West 612 feet,. a stake in the South bank of said river for the Northwest corner of the tract of land herein described;

"Thence South with the WB line of the Bennett L. Logan Survey 5755 feet to the place of beginning, containing 260 acres, more or less. And being the same land described in the aforesaid deed from G. W. Hancock and wife, Nannie Hancock, to Jeff Hancock with the addition of the accretions to said land which have accrued on account of the recession of Red River further North from its location as it existed in the year 1880."

In addition to the stereotyped allegations in trespass to try title, various statutes of limitation were plead on behalf of the plaintiff.

Defendant's reply was general demurrer, general denial, plea of not guilty, and specially setting up the various statutes of limitation. Further alleged that instead of the southwest corner of plaintiff's alleged land being the northwest corner of the Craddock-Coles' land, as alleged by plaintiff, said corner was at the time of said deed to Jeff Hancock, dated February 5, 1880, more than 28 poles north of the said Craddock-Coles' northwest corner; that by gradual erosion of plaintiff's said alleged land by Red River after the date of said deed, all of said land described in said deed was taken by the river and no land was left belonging to plaintiff at the time Red River began to recede, and no accretions by reason of such recessions belong to plaintiff, or to which plaintiff has claim of title.

The land in controversy is part of the Bennett T. Logan Survey and is a part of the 327-acre tract formerly owned by Elizabeth Arthur, an undivided one-half interest in and to which was conveyed to Nannie S. Hancock by Elizabeth Arthur on March 10, 1870. The description contained in this deed is as follows:

"The undivided one-half of a tract of land situated on Red River, Lamar County, Texas, and being part of the B. S. Logan H. R. Beginning at the N. W. corner of said Logan's survey, the same being the N. E. corner of Meredith Hart's on the bank of the river one mile north and 1/6 mile east of the mouth of Bois D'arc. Thence south to the N. W. corner of a 500 acre tract purchased by Craddock and Coles. Thence east with the north boundary line of said 500 acre tract to the west boundary of a tract of land surveyed by virtue of the H. R. of Dr. Hanslette. Thence north with the line of the same to Red River. Thence west up Red River with its meanders to the place of beginning, containing by estimate in all 327 acres, more or less."

Thereafter, on the 5th day of February, 1880, Nannie Hancock, joined by her husband, G. W. Hancock, by general warranty deed, conveyed to Jeff Hancock 125 acres, more or less, out of the 327 acres of land theretofore owned in common by Nannie Hancock and Elizabeth Arthur. The description in this deed is as follows: "Situated in the County of Lamar and State of Texas: Being a part of the headright survey in the name of Bennett T. Logan, Beginning at a stake on the bank of Red River it being the N. W. corner of said H. R. survey; Thence south with the W. B. line of the same 28 poles to a stake; thence east 144 poles to a stake; thence north 34 poles to a stake; thence west 58 poles to a stake; thence north 25½ E. 202 poles to a stake on the bank of said river; thence up said river with its various meanderings to the place of beginning, containing 125½ acres, more or less."

The plaintiff is duly vested with any and all rights and title passing by above mentioned deed.

There was no deed of partition in evidence partitioning as between Elizabeth Arthur and Nannie Hancock of the 327-acre tract which they jointly owned. There evidently was a partition of some character, however.

It will be observed that the beginning point of the description contained in plaintiff's petition is on the west boundary line of the Bennett T. Logan Survey at the northwest corner of a 500-acre tract of land out of said Survey formerly belonging to John R. Craddock and W. T. F. Coles, and which beginning point is 28 poles south of the point where the northwest corner of the Bennett T. Logan Survey bisected the south bank of Red River as it ran and according to its location on the 5th day of February, 1880.

The 5th day of February, 1880 was the date of the deed from G. W. Hancock and wife, Nannie Hancock, to Jeff Hancock. In this latter deed the beginning point is a stake on the bank of Red River, it being the northwest corner of such headright survey (Logan); thence south with the west boundary line of the same 28 poles to a stake.

J. W. Crook, the County Surveyor of Lamar County, testified on behalf of the plaintiff. He stated that he had recently surveyed the land twice; that he had assumed that the north boundary line of the Craddock-Coles' land was the south line of the Hancock land, that is, the land described in plaintiff's petition; that it was very difficult to follow the calls contained in the Hancock deed, that is, the deed conveying to Jeff Hancock the 125½ acres, because of the various changes in Red River; that the present location of Red River was not its location February 5, 1880; that the call in the Hancock deed was not for the actual northwest corner of the Logan Survey; it was for the northwest corner of what was left of the survey; that that point did not stay fixed on account of the river constantly changing, but meant the northwest corner of what was then there of that portion of the Logan Survey. The witness further stated that the north line of the Craddock-Coles' land had been located for years and years; that he presumed that the north boundary line of the Craddock-Coles' land was the south boundary line of the Hancock land; that that was the presumption; that there was no call in the Hancock deed (referring to the deed to Jeff Hancock) for the north boundary of the Craddock-Coles' land; that it just said "begins on the River and to go so many poles; that there was no partition deed and there is no way on earth to tell how far the Arthur land goes, because I didn't have any calls"; that in order to locate the 125-acre tract it is necessary to determine where Red River was on February 5, 1880.

It is manifest from the testimony of this witness that unless the first call from the point of beginning in the Hancock deed of February 5, 1880, terminated at the northwest corner of the Craddock-Coles' 500-acre tract, that the evidence fails to identify the land described in the plaintiff's petition with the land described in the deed conveying title to plaintiff to the 125½-acre tract. The present location of the point of beginning of the description in these deeds must be deduced from the location of the northwest corner of the 500-acre tract. It cannot be gainsaid that if you ran south 28 poles along the west boundary line of the Logan Survey to a stake, and that stake was at the northwest corner of the 500-acre tract, that reversing the call and running north from the northwest corner along the west boundary line, the location of the beginning point on the river would be established. The difficulty is, however, that the course of the call is along the west boundary line of the Logan Survey, south 28 poles to a stake, and does not call for the northwest corner of the Craddock-Coles' land for its termination or for any point in the northerly boundary line of that land. It does not call for any monument, natural or artificial. The location on the ground of the other river points is a matter of inference only. The river is not where it ran on February 5, 1880. There is nothing on the ground to locate it conclusively.

The deed from Nannie and G. W. Hancock, and practically all the deeds under which plaintiff claims, is a recognition of the fact that there had been a partition of the 327-acre tract, more or less, held by Elizabeth Arthur and Nannie Hancock in common.

Defendant offered in evidence a deed from Ballard M. Reed to Robert Arthur, dated January 1, 1915, where the entire 327-acre tract is described and excepting therefrom the part partitioned to G. W. and Nannie Hancock. In the deed from Robert Arthur and wife to defendant Moore, dated November 2, 1918, the description is confined to all of the land owned by the grantors in the Bennett T. Logan Survey situated and lying north of the 500-acre tract once owned by Craddock and Coles.

The evidence fails to establish beyond an issuable fact that under the partition the north line of the Craddock-Coles' 500-acre

tract was the southerly line of the land partitioned to Nannie Hancock. In paragraph 12 of the Court's findings of fact appears the following: "but the south boundary line of the said 125½ acres of land conveyed by Nannie Hancock and G. W. Hancock to Jeff Hancock on February 5, 1880, is somewhere approximately one-fourth of a mile north of the north boundary line of the Craddock and Coles' 500 acre tract."

In order for plaintiff to recover a part of the land sued for it was requisite that the evidence definitely locate and distinguish same. Masterson Irr. Co. v. Foote, Tex.Civ.App., 163 S.W. 642.

The evidence was before the trial court and different conclusions might be reasonably drawn therefrom. The only evidence of the contract of partition and the consummation thereof was by acts of the parties. The acts of the parties at best leave it as an issuable fact whether the call in the deed under which plaintiff claims, same being a necessary link in her chain of title, reached the northwest corner of the Craddock-Coles' land or just where the southern boundary of plaintiff's land was located. The finding of the trial court was against the plaintiff on this issue. We cannot say that it was unsustained by the evidence.

The burden was upon plaintiff to apply the description as plead with the description as contained in the deeds under which she claimed. Jones v. Andrews, 62 Tex. 652; Jones v. Andrews, 72 Tex. 5, 9 S.W. 170; Butler v. Brown, 72 Tex. 342, 14 S.W. 136; McDonald v. Downs, 45 Tex. Civ.App. 215, 99 S.W. 892; Long v. Shelton, Tex.Civ.App., 126 S.W. 40; Welles v. Arno Co-Operative Irr. Co., Tex.Civ.App., 177 S.W. 985; Ruth v. Carter-Kelley Lbr. Co., Tex.Civ.App., 286 S.W. 322.

The trial court found that the land "by gradual change of Red River and the encroachments thereof upon the land described in the deed from Nannie Hancock and G. W. Hancock (to Jeff Hancock), of date February 5, 1880, all of the land described in that deed was washed away and taken by the erosive processes of Red River at it gradually changed its course to the south; that in 1915 Red River began receding to the north and since that time has gradually receded to the northward to where it now runs, a distance of a mile or more north of its place of furthest advance south

in the year 1915; that the movement of the river northward was accompanied by accretions and deposits of the river to the land bordering on its south bank, during the time from the year 1915 to date." The legal consequence of the above finding as pronounced by the Court was in substance that plaintiff did not establish title to the accreted land. This legal conclusion follows from the fact found. Fulton v. Frandolig, 63 Tex. 330; Manry v. Robison et al. 122 Tex. 213, 56 S.W.2d 438; Wells v. Bailey, 10 A. 565; Wallace v. Driver, 61 Ark. 429, 33 S.W. 641, 31 L.R.A. 317; Widdecombe v. Chiles, 173 Mo. 195, loc. cit. 200, 73 S.W. 444, 61 L.R.A. 309, 96 Am.St.Rep. 507; Doebbeling v. Hall, 310 Mo. 204, 274 S.W. 1049, 41 A.L.R. 382.

These facts as found by the trial court justify the further legal conclusion, under the authorities just above cited, that the land described in the deed from Nannie Hancock and her husband to Jeff Hancock had ceased to exist.

The facts being established as to erosion and accretion, the law is well settled. There is more difficulty in determining the facts as to the processes involved in the changes of a river boundary. If the change is by erosion and accretion, the process is gradual, and, during its occurrence, imperceptible. By the latter statement is meant that the process is imperceptible, but not the result. If the change in the boundary is by erosion and accretion, the accreted portion becomes a part of the land along the river boundary to which it accreted. On the other hand, if the change in the river boundary is by avulsion, its occurrence is relatively sudden and ordinarily perceptibly visible. A change by avulsion is ineffective to change the boundary of the land involved or to work a legal extinction of the title. A submergence of the land by floodwaters, of itself, does not constitute an erosion such as to destroy the land, and if the lands subsequently reappear by reliction or accretion, the title is not changed.

It would not have been out of place, in discussing the question as to the identification of the land described in the field notes and the land described in the deeds under which plaintiff claims, to have discussed the evidence as to the nature and character of Red River in the location involved. In the question now under consideration such a discussion will at least tend to clarify matters.

It is to be borne in mind that Red River was part of the southerly border of the lands claimed under their deeds by both plaintiff and defendant; that Red River ran along the west side of a portion of the Hancock land. Under the evidence, in the locality involved here, the land is alluvial in character. The banks of the river have constantly changed from the date of the patent to the present time. Here we are primarily concerned with the changes in the river from February 5, 1880, the date of the deed from Nannie Hancock and her husband to Jeff Hancock. The evidence shows, or at least tends to show, that there were numerous changes in the river at this point. There was evidence of a washing away of the southerly bank of the river occurring in 1888, 1890, 1903, 1908 and 1915. These changes in the river all tend to throw the river further south. Further, that during their progress they reached some portions at least of the northerly part of the Craddock-Coles' land. In 1915 the evidence shows there was a flood. This flood washed out part of the northwest corner of the Craddock-Coles' land. After 1915 the southerly bank of the river, by accretion, proceeded gradually northward to its present position.

The above facts are not to be taken as to be conclusively established by the evidence, but merely that there was evidence tending to establish same.

The characteristics of Red River have been discussed by the courts. See Sharpe v. Womack, Tex.Civ.App., 73 S.W.2d 1058, in which was discussion of the effects of the overflow of 1915. The land there involved is perhaps in the same general locality of the land here involved. This case was before the Supreme Court, 127 Tex. 357, 93 S.W.2d 712.

In the Supreme Court the case of Doebeling v. Hall, 310 Mo. 204, 274 S.W. 1049, 41 A.L.R. 382, supra, is cited with approval, but on the question of the proper apportionment of accretions.

Red River was before the Supreme Court of the United States in the case of Oklahoma v. Texas, 260 U.S. 606, 635, 43 S.Ct. 221, 226, 67 L.Ed. 428, 429. In the course of that opinion Judge Van Devanter said:

"Oklahoma and the United States question the applicability of the doctrine of erosion and accretion to this river, particularly the part in western Oklahoma, and this because of the rapid and material changes effected during rises in the river.

But we think the habit of this river is so like that of the Missouri in this regard that the ruling relating to the latter in Nebraska v. Iowa, 143 U.S. 359, 368, 12 S. Ct. 396, 399 (36 L.Ed. 186 [190]), is controlling. It was there said [pp. 368, et seq.]:

"'The Missouri river is a winding stream, coursing through a valley of varying width, the substratum of whose soil, a deposit of distant centuries, is largely of quicksand. * * * The large volume of water pouring down at the time of these rises, with the rapidity of its current, has great and rapid action upon the loose soil of its banks. Whenever it impinges with direct attack upon the bank at a bend of the stream, and that bank is of the loose sand obtaining in the valley of the Missouri, it is not strange that the abrasion and washing away is rapid and great. Frequently, where above the loose substratum of sand there is a deposit of comparatively solid soil, the washing out of the underlying sand causes an instantaneous fall of quite a length and breadth of the superstratum of soil into the river; so that it may, in one sense of the term, be said that the diminution of the banks is not gradual and imperceptible, but sudden and visible. * * * No engineering skill is sufficient to say where the earth in the bank, washed away and disintegrating into the river, finds its rest and abiding place. The falling bank has passed into the floating mass of earth and water, and the particles of earth may rest one or 50 miles below, and upon either shore. There is, no matter how rapid the process of subtraction or addition, no detachment of earth from the one side and deposit of the same upon the other. The only thing which distinguishes this river from other streams, in the matter of accretion, is in the rapidity of the change caused by the velocity of the current; and this in itself, in the very nature of things, works no change in the principle underlying the rule of law in respect thereto.

"'Our conclusions are that, notwithstanding the rapidity of the changes in the course of the channel, and the washing from the one side and onto the other, the law of accretion controls on the Missouri river, as elsewhere, and that not only in respect to the rights of individual landowners, but also in respect to the boundary lines between states.'"

The plaintiff relies for part of the land claimed on the process of accretion. The

**52**

defendant's theory is erosion, consummating a complete destruction of plaintiff's land and the subsequent accretion to land the title to which was not vested in plaintiff. There is evidence tending to support both the theory of plaintiff and that of defendant. The court gave credence to the testimony of the defendant.

It is our conclusion that the findings of the trial court on the question of the failure of the evidence to identify the land as described in plaintiff's petition with the land described in the deeds under which she claims are amply sustained by the evidence. The findings as to erosion and accretion are sustained by the evidence to the extent that we are unwarranted in disturbing same.

The judgment of the trial court is affirmed.