## ANDERSON–TULLY CO. et al. v. CHICAGO MILL & LUMBER CO.

### No. 13877.

United States Court of Appeals
Eighth Circuit.

June 17, 1949.

Lamar Williamson, Monticello, Ark. (Williamson & Williamson, Monticello, Ark., were with him on the brief), for appellants.

C. E. Daggett, Marianna, Ark. (Daggett & Daggett, Marianna, Ark., were with him on the brief), for appellee.

Before SANBORN, WOODROUGH, and JOHNSEN, Circuit Judges.

WOODROUGH, Circuit Judge.

This appeal is taken to reverse a judgment entered in an action to quiet title to certain wild, unenclosed, unimproved land suitable only for growing timber, in Lee County, Arkansas. The judgment dismissed the plaintiff's action and quieted the title in the defendant as against all claims of the plaintiff.

The case was tried to the court without a jury under a stipulation of facts in which the parties agreed that it should "constitute all the evidence upon which the court will adjudicate the issues presented by the pleadings" and it appears that the controversy involves conflicting claims of ownership to an identified "area in controversy", based on purchases of tax titles and payments of taxes and that the rights of the parties are governed by the law of Arkansas. The matter for determination on the appeal is whether or not the trial court reached and declared a permissible conclusion as to the applicable law of Arkansas.

The stipulation of facts is lengthy and the findings of the court thereon are appended,[1] but it suffices for the purpose of this opinion to state that appellee owns the NE¼ of Section 19, Township 1 North, Range 6 East, in Lee County, Arkansas, a part of which was riparian to the Mississippi river in about 1891 and the "area in controversy" in the action (fully identified by metes and bounds in the judgment) is

---

[1] "I. Defendant, Chicago Mill and Lumber Company is the owner of the record title to the area originally surveyed in 1824 described as the Northeast Quarter (NE¼) of Section 19, Township 1 North, Range 6 East, in Lee County, Arkansas. Said record title is deraigned by mesne conveyances recited in subdivision 5 of the stipulation, and is based on early forfeitures for the non-payment of taxes and a Clerk's tax deed, the validity of which is not questioned.

"II. (a) At the time of the original Government land survey in 1824, the Northeast Quarter (NE¼) of Section 19 was original land. As then surveyed and platted, it contained 160 acres, and no part of it was riparian to the Mississippi River.

"(b) Subsequently, and prior to 1891, the Mississippi River eroded Southwestwardly into said Northeast Quarter (NE ¼) of Section 19 and had thereby destroyed a triangular portion of it, making it riparian to the River, as shown on "Exhibit C."

"(c) About 1891, the River reversed its lateral movement and by gradual erosion moved Northeastwardly, as a result of which that portion of the Northeast Quarter (NE¼) of said Section 19 which had been destroyed by erosion was reformed by accretion and so restored to its original acreage; as the River continued its Northeastward lateral movement, the entire 'area in controversy' was formed as accretions to said Northeast Quarter (NE¼) of Section 19, as is recited in subdivisions 3 and 4 of the stipulation.

"III. It is not shown exactly when the Northeast Quarter (NE¼) of Section 19 was restored to its original acreage by accretion, but:

"(a) By its decree in 1895, the Chancery Court of Lee County, Arkansas, in confirming the title of the St. Francis Levee District, as authorized by Act C of the General Assembly of the State of Arkansas, March 29, 1893, recited that the Northeast Quarter (NE¼) of said Section 19 contained 160 acres.

"(b) When the St. Francis Levee District conveyed this description in 1899, its deed recited that the Northeast Quarter (NE¼) of Section 19 then contained 160 acres.

"(c) By 1904 the accretions to said Northeast Quarter (NE¼) of Section 19 had moved far beyond the original boundaries of Section 19 and had reformed a large portion of the area originally surveyed by the United States, in 1824, as Section 17, Township 1 North, Range 6 East.

"It is, therefore, safe to assume that nine years after the River began its Northeastward lateral movement from the line of 'Maximum Recession'; and then the taxes were assessed against the Northeast Quarter (NE¼) of Section 19 for the year 1900, and when the Clerk's tax deed conveyed that description in 1903 (the validity of which con-

land which has, since about 1891, been added to appellee's riparian land by accretion. The appellee paid taxes on its said riparian NE¼ of Section 19 for nine consecutive years prior to the commencement of this action, and its predecessors in title paid taxes on it for more than 15 consecutive years. None of the payments or receipts therefor mentioned the accretions to the land and the receipts referred to the quarter section description for which taxes were paid as containing 160 acres. But under Arkansas law accretions belong to the owner of the riparian land to which they are added and they pass by conveyance describing said land without being further described or mentioned. Also generally the payment of taxes there upon descriptions of riparian land constitutes payment upon the accretions thereto and recitals in conveyances or tax receipts as to the amount of the acreage do not affect the results. Bush, Receiver v. Alexander, 134 Ark. 307, 203 S.W. 1028; Wallace v. Driver, 61 Ark. 429, 33 S.W. 641, 31 L.R.A. 317; Doebbeling v. Hall, 310 Mo. 204, 274 S.W. 1049, 41 A.L.R. 382, 389, Annotation; Towell v. Etter, 69 Ark. 34, 59 S.W. 1096, 63 S.W. 53; Crill v. Hudson, 71 Ark. 390, 74 S.W. 299; Mobbs v. Burrow, 112 Ark. 134, 165 S.W. 269; Plant v. Sanders, 209 Ark. 108, 189 S.W.2d 720; Sanders v. Plant, 211 Ark. 913, 204 S.W.2d 323. There is no slightest doubt that the sovereign state had full power to tax the accretions as soon as they appeared and as they expanded, but its policy to preserve the right of the riparian owner is manifest in its acceptance of his

---

veyance is not questioned), the entire 160 acres was land in place.

"IV. Defendant, Chicago Mill and Lumber Company, and its predecessors in title, paid taxes in the form and manner set forth in Paragraphs 6(a), (b), (c), (d), (e), (f), (g) and (h) of the stipulation.

"V. As stipulated in Paragraph 7(a), 'the Northeast Quarter (NE¼) of Section 19, and all of the 'area in controversy' which formed by way of accretions on the area originally surveyed as Section 17, 18 and 20, as shown on 'Exhibit B', is now and always has been wild, uninclosed, unimproved land, suitable only for growing timber'.

VI. (a) Plaintiffs, B. C. Tully and Anderson-Tully Company, are the owners of the record title to the entire area originally surveyed in 1824 as 457.33 acres, described as 'All of Fractional Section 17, Township 1 North, Range 6 East, in Lee County, Arkansas.'

"(b) Its record title is deraigned by the mesne conveyances recited in subdivision 8 of the stipulation.

"VII. (a) At the time of the original Government land survey in 1824, Fractional Section 17 was riparian to the Mississippi River and was surveyed as then containing 457.33 acres.

"(b) But, prior to 1891, the Mississippi River had eroded Southeastwardly into the Northeast Quarter (NE¼) of Section 19, thereby completely destroying all of Fractional Section 17, as originally surveyed in 1824.

"(c) About 1891 the River reversed its lateral movement, moved Northeastwardly, and as the result thereof, the entire 'area in controversy' was formed as accretions and new-made land, as recited in subdivisions 3 and 4 of the stipulation.

"VIII. (a) Plaintiffs have continuously and consecutively paid all taxes assessed against 'All of fractional Section 17' for the years 1922 to 1945, inclusive, as shown by stipulation 9(a) and 9(b).

"IX. All of the area which comprised Fractional Section 17, as originally surveyed, and all of the 'area in controversy,' is now, and always has been, wild uninclosed, unimproved land.

"X. The 'area in controversy' is properly shown in green color on 'Exhibit B' and is easily described correctly by metes and bounds.

"XI. If the area shown on M. R. C. Chart 25, 1913-15, ("Exhibit D"), which has been formed as accretions to the riparian shore line of 1891 (as it ran through Sections 18, 19 and 20 in said year) during the interim between the years 1891 and 1913, had then been apportioned according to Arkansas law, that portion of it apportionable to the Northeast Quarter (NE¼) of Section 19 would have, in 1913, been bounded by North and South lines, as shown on 'Exhibit B' and as described in stipulation, Paragraph 3(1), extended to the bank of the Mississippi River as it ran in 1913. (See Exhibit "D").

"XII. The approximate top Bank and Timber Line of the Mississippi River in October, 1904, is correctly shown by the broken blue lines as designated on Exhibit 'C'; and is also the Bar Line of that date by the solid blue line on Exhibit 'C'. (See stipulation, paragraphs 11(e) and 11(b).)"

tax payments on his original holding as and for payment on such holding with accretions. So that under Arkansas law the appellee was the owner of the NE¼ of Section 19 with all accretion thereto (which is the area in controversy in the action) unless there was proof to establish that appellants own it.

■ The appellants have a tax title to, and for the 24 years preceding the filing of this action have themselves or through predecessors in interest paid taxes on a description "Frl Section 17, Township 1 North, Range 6 East, in Lee County, Arkansas" and it is shown that that description appeared in the government survey of 1824 and there identified land in place then situated in the same geographical position now occupied by the accretions to appellee's land referred to as the area in controversy in this action.[2] Appellants rely upon that tax title and tax payments.

But prior to about 1891 the Frl Section 17 marked on the old survey was washed away by the river and was covered by the deep channel. The description ceased to identify any land in place which was subject to individual ownership or use. As the new land was thereafter formed by the accretions and was added to the riparian ownership, that is, to appellee's ownership, the description of the riparian land included the accretion and as the Arkansas court put it, "All original lines [implied in the old original description] ceased to exist." Wallace v. Driver, 61 Ark. 429, loc.cit. 423, 33 S.W. 641, 642, 31 L.R.A. 317. In that situation this court held, in Chicago Mill & Lumber v. Tully, 8 Cir., 130 F.2d 268, that in paying taxes on an obsolete description analogous to "Frl Section 17" of the old survey which had ceased to define land in place subject to private ownership and use did not operate to deprive the riparian owner of the accretions to his riparian land.

■ The ancient survey was not obsolete in the sense that it failed to identify a geographical situs. It marked the geographical location so that anyone could identify it as such. But it did not serve to connect the situs with ownership and that is

the purpose of a land survey. As was pointed out by the Arkansas Supreme Court in Bracken v. Henson, 211 Ark. 572, 201 S.W. 2d 580, 582, in discussing the survey necessary to identify an accretion severed from the mainland to which it has been added, "a survey is invalid which ignores the boundaries as defined in the title papers of the property owners. * * * The surveyor has no right or authority to ignore the existing boundary lines. On the contrary, it is his duty to make a survey conforming to the boundary lines and to make and have recorded a plat showing the survey thereof." The gradual changes in the river change the boundary lines of riparian owners and a proper survey must take those changes into account.

The questions we were required to consider and determine in the Chicago Mill & Lumber case may not be distinguished from those controlling here, and we there had the benefit of the learning and research of the same peculiarly qualified counsel who appear and have filed some 200 pages of briefs on this appeal. There the plaintiff had acquired tax title and had paid taxes upon descriptions of land that had been washed away by the Mississippi river. The area in controversy in the lawsuit had been thereafter formed by accretion to riparian land belonging to defendants. The defendants had long paid the taxes upon the riparian lands and owned the accretions unless divested by the plaintiffs' action. The master appointed by the trial court and the trial court concluded that under Arkansas law the defendants had not been deprived of their accretions. We affirmed the judgment.

The appellants here contend that the Arkansas law was not rightly declared in that case and argue (1) that the later decision of this court in Anderson-Tully Co. v. Murphree, 8 Cir., 153 F.2d 874, overrules it; (2) that our decision in Chicago Mill & Lumber overlooked certain Arkansas cases which are controlling and compel contrary decision, and (3) that the Arkansas Supreme Court has since handed down decisions contrary to our decision in the Chicago Mill & Lumber case.

[2] Said Frl Section 17 does not coincide geographically with the "area in controversy" but includes it.

(1) It is true that Anderson-Tully v. Murphree compelled our consideration of many of the same Arkansas cases that had been studied in Chicago Mill & Lumber Co. v. Tully, and the review shows that the vagaries of the Mississippi river have made it difficult for Arkansas to carry out her two clearly manifested purposes of preserving accretions in private ownership to riparian owners and of assessing and collecting from taxpayers and tax buyers all the land taxes she is entitled to. The legislative and judicial actions equally reflect the difficulties of the problem. In Chicago Mill & Lumber v. Tully, the riparian owner was awarded the accretions and the claims of the lumber company based on its tax payments and purchase of tax title were denied. In the Murphree case, the area in controversy was found not to be accretion but was island information that reappeared within the boundaries of the former owner. It was preserved to such owners by their tax payments upon their original holding under the special statutory provisions which we found to be applicable. The provisions preserved and restored the ancient descriptions and there were no riparian rights to accretions involved. We do not find our decisions in the two cases to be in conflict or that Murphree decision overruled Chicago Mill & Lumber Co.

(2) Our decision in Chicago Mill & Lumber Co. does not discuss Buckner v. Sugg, 79 Ark. 442, 96 S.W. 184, Maney v. Dennison, 110 Ark. 571, 163 S.W. 783, or Wells v. Rock Island Improvement Co., 110 Ark. 534, 162 S.W. 572, now asserted by appellants to be controlling as to the Arkansas law and in conflict with our declaration of it. But we did consider the first two of those cases in the Murphree case, discerning in them no reason to overrule our decision in Chicago Mill & Lumber, and counsel for appellee herein has now supplied us with even more complete analysis of them which tends to support his position here.

It appears as to the Buckner case that the area there in controversy had not had the status of originally surveyed land in private ownership under legal description like Frl Section 17 of the original governmental survey here involved. It had not been lost to its original owner by being washed away and having the channel of the river located over it and then having new land form on the geographical situs by accretion to riparian ownership. It had emerged from a lake bed where it had not been subject to private ownership. After it emerged it was surveyed and became popularly known by appropriate designation given to it by the surveyor extending the existing survey and was so taxed. The court answering the contention that a decree of tax foreclosure through which Buckner claimed was void because the description employed was defective in that a section 12 of the extended survey therein used had never been governmentally surveyed and therefore did not legally exist, said [79 Ark. 442, 96 S.W. 186]: "The controlling question in this case, therefore, is whether a description otherwise than by reference to plats of the original public survey or to other recorded plats properly identifying the tracts or lots of land, can be aided by extrinsic evidence of facts which serve to connect the description with the particular tract or lot sought to be charged. * * * We think that the description was, when aided by evidence, that the land has been surveyed, and is popularly known and designated thereby, sufficient to form the basis of a valid assessment and sale for levee taxes." Buckner v. Sugg does not require overruling the Chicago Mill and Lumber decision.

In Maney v. Dennison, Dennison sued to eject Maney from land which Dennison claimed to own under tax title and as accretion to adjoining land owned by him. Maney had no paper title but claimed title by adverse possession. The court found the land in controversy to be accretion added to land conveyed to Dennison and that his tax title describing the land as it was popularly known was also prima facie evidence of Dennison's ownership. It found that Maney had not adduced sufficient evidence of adverse possession for the statutory period to justify submission of his claim to the jury. The question whether a riparian owner had been divested of his accretions through tax sale under description of land entirely washed away was not involved. Wells v. Rock Island Improvement Co. does not throw light on this case.

(3) The decisions handed down by the Supreme Court of Arkansas since Chicago Mill & Lumber Company which appellants assert to be in conflict with our decision are Sanders v. Plant, 211 Ark. 913, 204 S.W.2d 323, decided June 23, 1947; and Burbridge v. Bradley Lumber Company, 215 S.W.2d 710, decided November 22, 1948.

As to the Plant case (which is one of two decisions of the Arkansas court settling many controversies between Sanders and Plant[3]), it appears that the court found a description [211 Ark. 913, 204 S.W.2d 325] "accretions in section 20, 60 acres" under which land was sold at tax sale to be void for uncertainty because it appeared that the area in controversy included accretions formed upon two different quarter sections and there had been a severance of the respective accretions from each of the riparian quarter sections. The court reiterated the law of Arkansas as it had been recognized by this court, that "a conveyance carries all of the riparian rights of the land conveyed * * * and a separate conveyance of riparian rights is unnecessary * * *" (1 syl.) and the decision implies, as we held, that the same principle controls as to tax payments and tax sales and titles. But in the cited Plant case the Supreme Court had before it an instance where the riparian owner of land and accretion to it had caused a severance to be made between her riparian land and the accretion as authorized by Arkansas statute and had secured a proper description of the accretion as a separate unit of land so that it could be identified for tax assessments and other purposes by reference to a plat of the survey she had caused to be made and which became a public record. Referring to that situation, there was added to the declaration of law we have quoted above, the following: "unless there has been a severance of the riparian rights from the land conveyed". (1 syl.) The cited Plant case does not conflict with the Chicago Mill & Lumber Co. decision and we are unable to discern any conflict upon study of the learned and comprehensive majority and minority opinions in Burbridge v. Bradley Lumber Co.

 The last mentioned opinions do bring forcibly home to us that Arkansas tax title law evolved from a vast amount of the hard work of learned and able men reflected in a large number of Arkansas decisions. But in the Chicago Mill & Lumber case and in this case the judgments appealed from were entered by judges also learned in Arkansas law. Judge Lemley correctly stated in his conclusions in the instant case that the facts bring it within the controlling facts in Chicago Mill & Lumber Co. v. Tully, and that the Supreme Court of Arkansas had not passed upon the questions involved here since decision in that case was rendered. In the performance of our limited function on this appeal, we conclude that the trial court reached and applied permissible conclusions as to the law of Arkansas not in conflict with controlling Arkansas statutes or decisions. Its judgment is therefore affirmed.

---

[3] The other being Plant v. Sanders, 209 Ark. 108, 189 S.W.2d 720.