## CHICAGO MILL & LUMBER CO. v. TULLY et al.

### No. 12143.

Circuit Court of Appeals, Eighth Circuit.

July 30, 1942.

J. B. Daggett, of Marianna, Ark. (Daggett & Daggett and C. E. Daggett, all of Marianna, Ark., on the brief), for appellant.

Lamar Williamson, of Monticello, Ark. (Williamson & Williamson, of Monticello, Ark., on the brief), for appellees.

Before GARDNER, WOODROUGH, and JOHNSEN, Circuit Judges.

WOODROUGH, Circuit Judge.

This suit was brought April 20, 1938, by Chicago Mill & Lumber Company to quiet title to an area of land in Desha County, Arkansas, of which the metes and bounds description in the complaint is:

"Beginning in the center of 'Chute of Island 73' where the same leaves the Mississippi River, as presently located; thence in a southerly direction along the center of said Island Chute and Knowlton's Bayou to where the same empties into the Arkansas River; thence in an easterly direction to a point on the bank of the Mississippi River as now located; thence in a northerly and northwestwardly direction along the bank of the Mississippi River, as presently located, following the meandering thereof to the point of beginning. It being the intention to describe all that area lying east of 'Chute of Island 73' and 'Knowlton's Bayou', North of Arkansas River and West of the Mississippi River."

Plaintiff alleged that the described lands are wild and unoccupied timber lands and that plaintiff claims title to them as an accretion to lands of which it is the owner, described as fractional section six on Island 73. Judgment was also demanded against the defendants for the value of timber wrongfully cut and removed from the lands. The defendants named in the complaint, B. C. Tully and Anderson & Tully Lumber Company, denied that the described lands are an accretion to the said land of the plaintiff and alleged that the part of the described lands which lie south of the north line of Section 13, Township 9 South, Range 1 West, extended east to the Mississippi River, are an accretion to Section 13 and to the adjoining section to the south numbered 24, both in Township 9 South, Range 1 West, North of Arkansas River, to which B. C. Tully has the legal title and that said accretion belongs to him. The pleadings presented other issues to be discussed later.

It appeared to the court that a master should be appointed in the cause to hear the evidence and to make and report findings of fact and law, and reference was accordingly made on the court's own motion to Mr. Charles S. Harley as such master. He heard the testimony and arguments of counsel and on the final submission of the matter to him the plaintiff requested a finding of fact that the area in controversy was an accretion to its fractional Section six on Island 73, but the master reported that he found as a fact that "B. C. Tully holds the legal title to Sections 13 and 24, T. 10 S., Range 1 W., 5 P.M., in Desha County, Arkansas", and that the lands in dispute "are in fact accretions" to said sections, and he concluded as a matter of law that "B. C. Tully is the owner of the lands in controversy as accretions to his lands." Upon exceptions taken to the master's report the District court considered the evidence and arguments extending over two days and overruled and denied the exceptions. It adopted the findings and conclusions of the master, and in the final decree the court finds that the lands in controversy are in fact accretions to the said land of defendant Tully and declares that Tully is the owner of them as accretions to his land.

The plaintiff contends in its present appeal that the finding and decision of the trial court and the master is not supported by the evidence and is against the weight

of the evidence or induced by an erroneous view of the law, and that it is entitled to reversal and decree in its favor.

The master reported that the proper description of the area in controversy, that is, the area claimed by defendants within the metes and bounds set forth in the complaint, is: "All that part of Sections 13 and 24, Township 10 South, Range 1 West of the 5th Principal Meridian, North of the Arkansas River, which lies east of Knowlton's Bayou, and all the area lying east of said Sections 13 and 24 to the Mississippi River; being all of the area described in the plaintiff's complaint which lies south of a line made by extending the north boundary line of said Section 13, Township 10 South, Range 1 West, N. A. R., east to the Mississippi River, and which if surveyed would be described as all of Sections 17, 18, 19 and 20, Township 10 South, Range 1 East, North of the Arkansas River, in Desha County, Arkansas.

"The defendants Anderson-Tully Company and B. C. Tully do not claim to own any of the area lying north of this line (the north boundary line of Section 13 extended east to the Mississippi River) which would be designated, if surveyed, as Frl. Sections 6, 7 and 8, Township 10 South, Range 1 East of the 5th Principal Meridian, N. A. R."

This description of the area as the area claimed by defendants and in controversy was agreed upon by the parties and it will be observed upon comparing it with the metes and bounds description in plaintiff's complaint that in the complaint the west line of the lands claimed by plaintiff is the center of "Chute of Island 73" and "the center of said Island Chute and Knowlton's Bayou". The "chute" of an island in the Mississippi River is a channel of the river flowing between the island and the nearer mainland and plaintiff's description was meant to convey that a chute or channel of the Mississippi River ran from the north to the south extremities of its lands on the west side thereof. It gave the river itself as the east boundary, so it pictured an island entirely surrounded by the Mississippi River and a western channel thereof. Although its description recognizes the existence of waters designated "Knowlton's Bayou", it identifies the chute and bayou as one river channel along the center of which it drew its west line. The defendants recognize no chute or channel of the river in the area they claim to be an accretion to their Sections 13 and 24. They claim the water found there is not and never has been a channel of the river, but is a bayou properly designated Knowlton's Bayou, which drains a local water shed and lakes and emptied originally into the Mississippi River above their north line but which has later turned southerly and found its way in a winding course across their accreted land on south into the Arkansas River.

The master found:

"In 1834 and 1835, when the first government survey of lands in this section was had, there was lying in the navigable stream of the river and separated from the west bank of the Mississippi River, which is the eastern shore line of the State of Arkansas, a small island, denominated upon the plat as Island 73, the intervening channel between that island and the Arkansas shore being known as the chute of Island 73. On the south end of this Island was surveyed a parcel of land as Fractional Section 6, Township 10 South, Range 1 East, NAR, 59.49 acres. The testimony of witnesses and the exhibits introduced disclose that the channel of the Mississippi River flowed around Island 73, turned in a southwesterly direction until a point opposite Sections 13 and 24, Township 10 South, Range 1 West, 5th Principal Meridian, NAR, hereinafter mentioned, and then turned in a southeasterly direction and around a peninsula, and then in a direction southwest by west, forming a narrow neck of land just below Sections 13 and 24 between the Mississippi and Arkansas Rivers. During this period, when this current of the river was impinging upon the shore line of Sections 13 and 24, there was a caving bank from above the north line of Section 13, down to the shore line of the SE¼ SE¼, Section 24. This movement of the river continued until some time during the year 1863, when there occurred an avulsion, and the Mississippi River cut through the narrow neck of land into the Arkansas River and destroyed the town of Napoleon, Arkansas, and formed the Napoleon Cutoff of 1863. The river continued its westward movement until some indeterminate time. Prior to Napoleon Cut-off above mentioned, Knowlton's Bayou, which drained Knowlton's Lake, intersected a bayou known as the Bayou of Moore's Lake, somewhere in the SE¼ SE¼, Section 12 [which is immediately above de-

fendants' Section 13],[1] and then flowed east into the Mississippi River, above and north of the north line of Section 13 above mentioned.

"At that time, the chute of Island 73 ended at some point north of the confluence of Knowlton's and Moore's Bayous and the mouth of Knowlton's Bayou, in the channel of the Mississippi River.

"While the westward shift of the channel of the Mississippi River was in progress, a portion of the lands which had been surveyed by the government as shown by the plat of 1835, as Island 73, eroded away on the north and east of Island 73, and this erosion continued until today any land occupying that geographical position lies within the State of Mississippi.

"It appears, from all the plats and evidence, that the original westward shift continued until it formed what is shown on the exhibits as 'the old high bank of the Mississippi River in 1874', in the East Half of Sections 13 and 24, and sometime after 1874 the channel of the Mississippi River began an eastward shift, which continues to this date, building accretions along the Arkansas shore and eroding the bank on the Mississippi side, and during this shift the lands in controversy have been formed."

Having thus identified the area in controversy as land which has been built up by the process of accretion (that is, by a gradual as distinguished from sudden action of the river) during the period commencing some time after 1874, continuing to the present day (which is conceded by the parties), the master proceeded to the question whether the area was an accretion to defendants' Sections 13 and 24 or otherwise formed. He observed that the evidence upon this disputed issue was voluminous and exhaustive and had been presented by skilled and able counsel with long years of experience in litigation of this kind. "Witnesses have appeared in this case who have viewed the area in controversy, who have studied the land formations, tree growth, vegetation, the history of the river and probably all the plats, maps and surveys of this area that are extant (and these have been introduced in evidence and studied by the master) and all of the facts have been presented that could be presented at this time to any tribunal. No good purpose could be served by an attempt to state this vast volume of evidence, and the master will not attempt to do so. * * *". He stated that the parties conceded "that accretions did begin to form against and as accretions to Sections 13 and 24 and that defendants are the owners of the very considerable accretion between the old high bank of 1874 in Sections 13 and 24 (which bank concededly ran in almost a straight line north and south through Sections 13 and 24) and Knowlton's Bayou. He said that a great deal of testimony had been introduced and time spent in the writing of briefs on the question of whether or not the water course in front of Sections 13 and 24 "is properly Knowlton's Bayou or Chute of Island 73" and he found that "this water course * * * is in fact Knowlton's Bayou."

Having found that the river began to form accretion in front of defendants' riparian land after 1874, that it has continued to add to such accretion up to the present day, that the Chute of Island 73 ended at the confluence of bayous north of Section 13, and that the water intervening between the 1874 bank and the present river bank was Knowlton's Bayou, the master proceeded to his ultimate finding that the area in controversy is an accretion to defendants' Sections 13 and 24. He was of opinion that on the whole evidence the defendants had made a stronger case that the lands in front of their Sections 13 and 24 were accretions to their sections than the plaintiff had made in support of her claim to accretions in the case of Dowdle v. Wheeler, 76 Ark. 529, 89 S.W. 1002, 1003, 113 Am.St.Rep. 106. The master observed (as the parties concede) that the laws and decisions of Arkansas are controlling in the case and he stated that the facts in the Arkansas case referred to and those in the case at bar were so nearly alike that decision here must be made in the light of the decision there. He said:

"All the evidence in this case, together with the exhibits, convinces the master that the area in controversy began as accretions to Sections 13 and 24. In Dowdle v. Wheeler, supra, the court said, 'A careful consideration of the evidence convinces us that the Chancellor was correct in his conclusion that the land in controversy was an accretion to the original tract of Mrs. Wheeler [who is comparable to the Defendants in this case]. There is much

---

[1] Interpolated.

plausibility in the contention of appellants, but it ignores certain facts clearly established by the evidence. They contend that the channel of Point Remove creek runs with the old bank of the river, but it is established by the proof that there is a narrow margin of accretion between the old shore line of the river and the bank of the creek. This goes to show that there was a deposit against the shore line before the waters of the river receded, that this process continued until the bed of the river rose to the level of the creek's bed, and that then, as the waters of the river receded, the flow from the creek prevented further deposits in its extended channel and established a permanent channel along the old bed of the river. This theory is, we think, far more consistent with the physical facts existing now, and within the recollection of witnesses, than the theory advanced by appellants, that the flow from the creek followed the recession of the waters of the river before there could be a deposit against the old shore line, and that the deposit began at the extended south bank of the creek. If the deposit formed in the manner which we have stated, it is, in a legal sense, an accretion to the lands of appellee and became her property, notwithstanding the conceded fact that the flow of water from the creek separated it from the original tract.' "

## Opinion.

It appears from the evidence brought up on the appeal that the defendant Anderson-Tully Company acquired Sections 13 and 24 in 1899 and the only change in title has been by a deed from the company to its president, B. C. Tully. As soon as the title was acquired Mr. Jared H. Martin, a competent and experienced surveyor of high standing in his profession, was employed to run and mark off the boundaries of the property. He made his survey in October, 1899, and his field notes received in evidence without objection show that he followed the north line of Section 13 east "to the bank of original Mississippi river before the cut off at mouth of Ark. river was made ['Napoleon cutoff']² and said Mississippi river began to recede Eastwardly" and then proceeded East along said north line across the accretion land to the river. He found and crossed "Knowlton's Bayou 100 links wide and runs S.W." He made no notation of finding any chan-

nel of the river or chute—only the accretions left as the river had receded easterly.

Some nine years later defendants employed another competent and experienced surveyor, H. G. Martin, who ran his survey in 1908, according to his field notes in evidence, along the same north line of Section 13 East to the river as it then flowed. He found "a Lake" 200 links wide at the location of Knowlton's Bayou, but made no note of any river channel or anything to indicate any interruption of the accretion between defendants' land and the river as it then flowed.

Defendants' property line was marked with red paint in accordance with the surveys and from 1899 to the present the defendants have treated the area south of the line run by the surveyors as extended as their own. They have cut the timber at intervals and have always excluded trespassers through the continuous employment of guards. The Thane Lumber Company marked off the lands to the north with marks to indicate that it owned them, and it also cut the timber thereon and excluded trespassers therefrom through employment of guards. The plaintiff claimed the lands further north and it also marked off its lines to indicate its ownership, cut the timber thereon and excluded trespassers. Through the period since 1899 there was no boundary line dispute though the three owners were well informed of each others' claims and operations.

In the fall of 1938 after the commencement of this action, Mr. Tully went upon the lands with a surveying party of eight persons, all of whom testifying in the case appeared to be intelligent, alert, observant men who thoroughly understood the work in hand, which was to determine and disclose the origin and true nature of the land in controversy. The task involved study of the maps and profiles prepared from surveys made at different times in the past and comparisons between conditions shown to have existed at different times and at the time of the work, study of the physics and hydraulics of the Mississippi river and comparisons between ascertained water levels and references back to the recognized government gauges, close observation and understanding of the terrain itself and all the physical indications of the actions of the river, as well as the character of all the tree growth. Study of

² Interpolated.

the regimen of the river in any given period, that is, the relation of areas upon which the currents of the river worked to cave off its banks and the areas traversed more gently without eroding the banks (i. e., the points and bends), was also important and was considered. The techniques may only be mastered by hard work long continued.

The surveyor in charge of the party was Mr. St. George Richardson, a thoroughly qualified civil engineer of forty years' experience, frequently called upon to settle the vexing questions caused by the action of the Mississippi river. Mr. Richardson availed himself of all of the means recognized as helpful or relevant to the performance of his task. He set forth his determinations in the form of a written report and also testified in great detail as to his studies, surveys and observations on the ground. He says that the surveys of Jared H. Martin and H. G. Martin of the boundary line extended east along the north line of Section 13 and the meander of the river which he checked on the ground and 'ound to be correct was proper and in accordance with custom in measuring accretions under the conditions presented. That the river channel referred to as Chute of Island 73 has never extended southwardly as far as the north line of Section 13 extended east; that the stream now found upon the area in controversy is Knowlton's Bayou; that Knowlton's Bayou created its own location across the formation as the same grew in front of defendants' land and that the area in controversy is an accretion to said land.

Before he was called on to testify Mr. Richardson was given opportunity to and did study the maps, profiles, exhibits and the expert and lay testimony offered by the plaintiff. He discussed it in detail. He said that his study of the terrain itself and the timber growths which decline in age .from the west to the east and the physical evidence he observed on the ground showing what had occurred in the land's formation, proved that the area was an accretion to defendants' land and he could have so testified, even if he had not seen the maps or studied former surveys. But he found in each of the maps, charts and exhibits, as well as in the details of contour and levels pointed out and relied on by plaintiff, further confirmation and verification of his conclusion that the accretion was to defendants' land. His cross-examination was brief and produced no retraction or qualification of his testimony.

Mr. Tully was with Mr. Richardson throughout the survey and examination on the ground. He had been personally familiar with the area for more than a quarter of a century and had previously accompanied surveyors when new formation land was being surveyed for apportioning accretions. He was thoroughly familiar with all that Mr. Richardson did, and observed all the physical appearances of the terrain noted by Richardson. He had studied the maps and the report of Mr. Richardson and the testimony of plaintiff and was willing to and did state on his own oath that the area in controversy is indeed accretions to his two sections and is not an accretion to other area.

The other members of the party participating in the work corroborated Mr. Richardson in detail and each testified positively that the accretion was to the defendants' land. Without reaching the degree of scientific expertness manifested by Mr. Richardson, their experience and close participation in the work, with complete understanding of the relevance and significance of what was done on the ground and noted there, of the relevance and significance of prior surveys and deductions therefrom by plaintiff's witnesses as well as by Mr. Richardson, and of all the controlling factors, fully qualified them to testify as they did that the land was accretion to defendants' land.

Mr. W. E. Elam, a qualified civil engineer of high standing and reputation who has been familiar with the alluvial valley of the Mississippi river for the past third of a century and "was the author of the cutoff program on the river which has changed the history of its flood control", also testified that the area in controversy is an accretion to the mainland of Sections 13 and 24. He studied all the data from former surveys in evidence and made his investigation on the ground and was convinced that the Chute of Island 73 ceased to act as a chute immediately after the Napoleon Cut Off in 1863; "and that the reversal and the cross over of the river had thrown the current out of the chute". He said that the accretion had built out from the defendants' land and as the accretion extended Knowlton's Bayou "just wriggled across it along the line of least resistance." He pointed out that the stream opposite defendants' land does not

have the characteristics of a river chute but is plainly a bayou. · (A bayou is the sluggish outlet from, or inlet to, a lake or a bay, the word being derived possibly from the French word boyau, meaning an intestine.) It is Knowlton's Bayou receiving water from a considerable local water shed and from its own and Moore's Lake, carrying no silt and pursuing a meandering course characteristic of bayous, very unlike the comparatively straight course characteristic of chutes. He stated as to the charts, maps, surveys and all the testimony that "you have got to take the whole picture and select the dominating facts and that I did."

In order to understand the testimony of the foregoing witnesses it has been necessary to follow their surveyed lines, the lines, figures and references upon the maps, composite maps, charts and exhibits in evidence and to become familiar with the testimony on both sides of the controversy. The study convinces that there was testimony of the most substantial character supporting the finding of the master and the trial court that the area in controversy is an accretion to defendants' land.

The appellant recognizes that the fact finding of the master, approved and adopted by the District court, may not be set aside on review in this court unless it is unsupported by substantial evidence, is clearly against the weight of the evidence, or was induced by erroneous view of the law (Aetna Life Ins. Co. v. Kepler, 8 Cir., 116 F.2d 1), but it insists there are facts positively established in the evidence which demonstrate conclusively that the accretion was to its land and that the finding was against the weight of the evidence and clearly erroneous.

The argumentation to establish the contention is extended over nearly a hundred pages of brief related throughout to the lines, figures, symbols, markings and notations on maps, composite maps, charts, drawings, photographs, computations and other exhibits, and has presented a study of engineering research of fascinating interest. We agree with the statement of the master's report that "there is no question of the credibility of the witnesses." The river engineers devote themselves with utmost conscientiousness to their arduous task of defining the mysterious vagaries of the grand stream as it "writhes like an imprisoned snake throughout its alluvial valley in futile effort to establish equilibrium",

and their testimony here conforms to the tradition of the profession. But it is apparent that the area here in controversy situate between the White River, the cut off thereof, the Arkansas and the Mississippi Rivers in an historically volatile territory began its formation about 1874, sections of land have been submerged and new land formed on the site thereof and all government marks situ have been washed away. We find no witness asserting that there is any one single criterion by which the ultimate issue of fact can be absolutely settled. That "You have to take the whole picture and select the dominating facts" is not contradicted.

The plaintiff has laid great stress on the fact that upon the maps published by the Mississippi River Commission and elsewhere the waters traversing the area in controversy are marked "Chute of Island 73." Defendants' witness Mr. Richardson said of these maps (particularly the maps of 1879–80), "it is the first accurate map, and I believe, in my opinion, is one of the most accurate maps that the Mississippi River Commission has ever put out." But he explained the purposes for which the survey and maps had been made in connection with the development and control of the river and that the mere naming of the waters Chute of Island 73 at the places where the designation was inserted upon the maps was immaterial to the purposes, and he testified to his opinion that the naming of the water in the controverted area had not been prescribed by the engineers in charge but by others who had to do with the completion of the maps from data furnished them by the engineers, and that the name at the place it appears had been merely carried forward. Mr. Richardson pointed out as illustrative of the restriction of the Commission to its intended purposes that its later map of 1913–1915 does not even disclose the existence of Knowlton's Bayou, though it was indisputably present, and ascribes no name to the water traversing the area in question. There was no evidence that the Chute of Island 73 had ever been navigable and there was persuasive testimony that no one had ever called the water in the controverted area anything but Knowlton's Bayou. Defendants' testimony was not contrary to reason or incredible.

We think the cases cited by appellant where ancient identifications, measurements or landmarks fixed upon established

maps are sought to be nullified by oral testimony are without application in this case. Defendants' witnesses gave due and proper weight to all the discoveries that had been made and recorded by their predecessors in the field.

It is also urged that it should be found from the computations made upon comparisons between elevations shown to have existed in the area and water levels shown by the government gauges at Memphis or White River that the stream was a chute or river channel at the place in question and not a bayou. But we find none of the figures given either conclusive or even strongly probative in support of that contention.

Plaintiff's theory is that the accretions moved down from the north where its fractional section six was situated before it was washed away, in the shape of strips of land extending like the fingers into the water, and so was gradually filled and built up from the northeast to the southwest from plaintiff's land into its present state. It relied largely upon inferences to be drawn from the elevations at different times of the succession of ridges and depressions which run generally from east of north to the west of south from above and through the area. But the qualified and experienced witnesses for the defendants found in these physical manifestations, as in all the others observed on the ground and portrayed upon the maps, positive proof that the area had accreted to defendants' land. Their testimony supports the finding of the master and the District court.

■ It is, of course, unfeasible to epitomize in an opinion the matter which the appellant has with difficulty compressed into the brief of 125 pages. Our conclusion on consideration of all of the contentions regarding the fact issue is that the finding assailed is well supported by substantial evidence; that the river itself and not a chute or channel thereof had cut into defendants' land and made it riparian in 1874; that the river itself then gradually receded to the east and in so doing added accretions to defendants' land which have been gradually extended to include the area in controversy; that the river channel called the chute had nothing to do with the accretions formed and never divided them; that the locally collected water in Knowlton's Bayou which previously had run into the Mississippi River became deflected southerly and found its meandering way as it now runs into the Arkansas River through accretions, the timber on both sides of it being identical.

■ Other Issues. Although the defendants have fully paid the taxes on the area in controversy under its proper and legal description as Sections 13 and 24 since 1899 and have attempted to make payments upon accreted lands in addition, it appears that plaintiff purposely forestalled them (there was a "scramble") and acquired tax titles and paid taxes on the unsectionalized lands within the area upon descriptions such lands would have had if they had been sectionalized, and it asserts title under the tax sales pursuant to Section 8920, Pope's Digest, State of Arkansas. We think the master and trial court correctly held that plaintiff's payment of taxes upon the nonexistent descriptions was unavailing to deprive the defendants of their accretions. Plaintiff concedes that all of the area surveyed on the government plats as Sections 18, 19, 20, etc., caved into the Mississippi River and the present formation is all remade, reformed land, and not the land shown by the original survey. There are now no such legal descriptions. Bush, Receiver, v. Alexander, 134 Ark. 307, 311, 203 S.W. 1028; Wallace v. Driver, 61 Ark. 429, 433, 33 S.W. 641, 31 L.R.A. 317; Doebbeling v. Hall, 310 Mo. 204, 274 S.W. 1049, 41 A.L.R. 382, 389, Annotation; Towell v. Etter, 69 Ark. 34, 59 S.W. 1096, 63 S.W. 53. The defendants were fully protected in their title by their tax payments upon their lands by proper legal descriptions for more than forty years. Crill v. Hudson, 71 Ark. 390, 74 S.W. 299; Mobbs v. Burrow, 112 Ark. 134, 165 S.W. 269; Towell v. Etter, 69 Ark. 34, 59 S.W. 1096, 63 S.W. 53; 67 Corpus Juris 829, § 241; 45 Corpus Juris 533, § 203.

■ The plaintiff also adduced evidence to the effect that the area in controversy was an independent island formation in the Mississippi River. This was in conflict with the allegations of the complaint and the testimony presented was not persuasive. Yet the plaintiff proceeded on the theory to the point of obtaining through Honorable Otis Page, Commissioner of State Lands in Arkansas, a State donation deed under authority of Act 282 of General Assembly of Arkansas, approved March 21, 1917, Sections 8739–8745, Pope's Digest, Laws of Arkansas, upon the representation that it was not accretion land but was an

independent island formed after the admission of the State of Arkansas to the Union in 1836. The Commissioner testified, "My information was that the party making application for this island deed had title to it [the land][3] and this was the quicker way to clear up that title." The deed was issued without the inquiry required by the statute. Though we concur with the master and the trial court that there was no independent island formation, we cannot but ascribe significance to the plaintiff's conduct in respect to this claim. Its position in this court is that the proof of the fact that the accretion of the area in controversy was to its fractional section six is of such conclusive character that this court can and should strike down the finding of the master and the District court to the contrary. Yet the plaintiff itself was so lacking in confidence of its position that it obtained and adduced this contradictory testimony.

As we have found no basis in the evidence to conclude that the title openly asserted by defendants without question since their survey in 1899 is defective or that the findings and decree appealed from were unsupported by substantial evidence or contrary to the weight of the evidence or induced by erroneous view of the law, the decree is affirmed.