**BANKS et al. v. CHICAGO MILL & LUMBER CO.**

No. H–273.

United States District Court
E. D. Arkansas. E. D.
July 25, 1950.

De Witt Poe, McGehee, Ark., Cracraft & Cracraft, George K. Cracraft, Sr., and George K. Cracraft, Jr., all of Helena, Ark., for plaintiff.

Daggett & Daggett, J. B. Daggett, John T. Williams, all of Marianna, Ark., for defendant.

Williamson & Williamson, Lamar Williamson, all of Monticello, Ark., amici curiæ.

LEMLEY, District Judge.

This is an action involving the title to certain Arkansas River accretions, locally termed "Quandt Island", and situated near Arkansas Post, Arkansas. The cause was submitted on depositions, written briefs and oral argument. At the conclusion of the case the Court made the following findings of fact, conclusions of law, and comment thereon.

## I. Findings Of Fact

1. Plaintiffs are citizens of Arkansas; Defendant is a corporation organized and doing business under the laws of the State of Delaware and is a citizen of Delaware. The amount in controversy in this case, exclusive of interest and costs, exceeds $3,000.00.

2. Certain facts have been stipulated by the parties and the Court finds those facts in accordance with the several stipulations of counsel filed herein.[1]

3. The Fractional Northeast Quarter of Section 23, Township 8 South, Range 3 West of the Fifth Principal Meridian, South of the Arkansas River, was eroded away by the Arkansas River between 1839 and January of 1872.

In 1839 this parcel of land contained 54.26 acres and was riparian to the right descending bank of the Arkansas River, and was located in a bend of the river which included portions of Sections 14, 15, and 22, as well as the Frl. NE ¼ of Section 23 and other parts of Section 23. Located within this bend was a meandered navigable lake known as Madam Josey's Lake. The northern and eastern portions of this lake were located in part in said Frl. NE ¼ and the right bank of said lake at its easternmost point was within slightly less than one chain's length from the river. The western extremity of the lake was located about 250 feet from the river on the western side of the above mentioned bend.

At some time between 1839 and approximately 1871 the river eroded into the eastern end of the lake in the Frl. NE ¼ of Section 23 and thereafter eroded gradually into said parcel of land so that by approximately 1871 a large portion of it had been eroded away. In approximately 1871 the

---

1. The facts stipulated deal primarily with the respective chains of title of the parties and the tax history of the area in controversy. Such of these stipulated facts as have particularly influenced our decision are discussed in our "Comment", *infra.*

river entered the western end of the lake and adopted the lower arm thereof as its main channel, forming what is known as "Smith's Cut-off". After this action took place, the erosion of the Frl. NE ¼ of Section 23 continued until by January of 1872 said Frl. NE ¼ of Section 23 had been completely eroded away. After 1872 the Southward erosion of the river continued until approximately 1882.

The Frl. NE ¼ of Section 23 completely lost its identity as a result of this erosion, and it has never been restored. Since approximately 1871, and at the time the present suit was filed, no such legal description as "Frl. NE ¼ of Section 23, Township 8 South, Range 3 West, South of Arkansas River", has been in existence, and such a description has not since that time described or identified any land in place. That description had been destroyed by the river's erosion, and certainly after 1872 that description ceased to identify any land in place.

From 1872 until 1882 or thereafter the geographical area formerly occupied by the Frl. NE ¼ of Section 23, Township 8 South, Range 3 West, was all located North of the Arkansas River.

4. The Frl. NE ¼ of Section 23, Township 8 South, Range 3 West, South of the Arkansas River, was not destroyed by an avulsion or by any action of the river which might be described as "avultive". Plaintiffs have failed to prove by a preponderance of the evidence that the erosive process which destroyed said parcel of land was other than gradual or in anywise different from the customary bank caving frequently observed along the Arkansas River and similar streams.

5. The area in controversy was formed as true accretions to Spanish Grant No. 2363 between approximately 1870 and 1900. This Grant lay on the North or left descending bank of the Arkansas River. Shortly prior to 1900 this area was cut off from the Grant by an avulsion of the river (known as the Quandt Island Avulsion), and after said avulsion it lay on the South side of the river and became known as Quandt Island.

6. Spanish Grant No. 2363 is located in Arkansas County, Arkansas, and the area in controversy, being an accretion to said Grant, was in Arkansas County at the time of the Quandt Island Avulsion and remained in Arkansas County after said avulsion at least until after 1938. Said area was placed on the tax books of Arkansas County each and every year from 1931 through 1938, inclusive, under the description "Lot 3, Spanish Grant No. 2363", and all taxes for each and every one of those years were paid by defendant's predecessors in title. Said payments were made under color of title.

7. The defendant and its predecessors in title have been in the constructive possession of Quandt Island and have paid taxes thereon, including the area in controversy, under color of title, for more than seven (7) years prior to the institution of this suit; and are in fact the owners thereof.

8. Plaintiffs have never been in either the actual or constructive possession of the area in controversy. In this connection plaintiffs claim that they have been in the constructive possession of the area by virtue of tax payments made over a long period of time by them and their predecessors in title under color of title based upon two tax deeds from the State of Arkansas.

The first of these deeds was issued in 1884 to the Little Rock, Mississippi, and Texas Railway Company; this deed was based upon a forfeiture in 1869 for 1868 taxes of the Frl. NE ¼ of Section 23, Township 8 South, Range 3 West, South of River" in Arkansas County, Arkansas. After this deed was issued to the Railway Company above mentioned, said Company and its successors paid taxes on this description for each and every year up until 1927. This deed, however, was not color of title because it did not describe any lands in place or in existence of "subject to individual ownership or use". Moreover, during this period of time the area in controversy was never in Desha County, Arkansas, but, on the contrary, was located in Arkansas County as an accertion to Spanish Grant No. 2363.

The second of these deeds was issued in 1937 by the State Land Commissioner to the S. A. Banks Estate (plaintiffs herein) and

was based upon a forfeiture to the State for non-payment of 1927 taxes in Desha County. The description under which this land was forfeited and sold to the State and the description contained in the deed from the Commissioner to the Banks Estate was "Frl. NE ¼ of Sec. 23, Twp. 8 S., R. 3 W., South of River". This deed was not color of title because it did not describe any lands in place or in existence. Moreover, when the above mentioned description was forfeited to the State, the area in controversy was in Arkansas County, Arkansas.

Tax payments by the plaintiffs and their predecessors under these two deeds did not amount to constructive possession of the area in controversy.

9. Plaintiffs have failed to sustain the burden of proving that they own the area in controversy or any part thereof.

## II. Conclusions of Law

1. The Court has jurisdiction of this cause and of the parties hereto.

2. The plaintiffs having failed to sustain the burden of proof in this case, their complaint must be dismissed.

3. As a matter of law, the plaintiffs are not entitled to a decree for any of the relief for which they have prayed.

4. As a matter of law, the title to the area in controversy is completely vested in the defendant, Chicago Mill & Lumber Company, and it is entitled to the decree for which it prays.

## III. Comment

Plaintiffs brought this action to quiet title to the area in controversy and to recover damages for the value of timber alleged to have been cut and removed therefrom by the defendant. By answer and cross-complaint the defendant denies any liability to the plaintiffs, claims ownership of the area in controversy, and prays that its title be quieted and confirmed against all claims of the plaintiffs.

It is conceded that if the plaintiffs are to secure relief upon their complaint, they must do so upon the strength of their own title, and that the burden is upon them to establish by a preponderance of the evidence the fact that they own the area in controversy. It is likewise conceded, on the other hand, that if the defendant is to prevail upon its cross-complaint, it must do so upon the strength of its title, and that upon said cross-complaint the burden of proof is upon the defendant.

We have concluded that the plaintiffs have failed to discharge their burden of proof, and that their complaint must be dismissed, and we have further concluded that the defendant has established its title to the area in controversy by a preponderance of the evidence, and that it should prevail upon its cross-complaint.

The area in controversy occupies, in part, the geographical location of what was originally the Fractional Northeast Quarter of Section 23, Township 8 South, Range 3 West, South of Arkansas River, in Arkansas County, Arkansas. According to the official Government survey of 1839 this fractional quarter section contained slightly more than 54 acres of land and was riparian to the right descending (south) bank of the Arkansas River. During the year 1869 this tract of land was sold by the taxing authorities of Arkansas County to the State of Arkansas for non-payment of taxes for the year 1868. The tract was not redeemed and was certified to the State. In 1879 the State undertook to donate the Frl. NE ¼ of said Section 23 to the Little Rock, Mississippi, and Texas Railway Company, and a deed covering this description was executed to said railroad in 1884. This company and its successors paid taxes on this description in Desha County, Arkansas, each and every year from 1884 through 1926. Plaintiffs hold a deed from the successors to the railroad.

No taxes were paid in Desha County on this description covering the year 1927, and in 1928 the description was sold to the State and thereafter duly certified. This sale was confirmed in 1937. Subsequent to the sale the plaintiffs obtained a deed from the State Land Commissioner which conveyed to them any interest which the State may have had arising out of this forfeiture.

It is the theory of the plaintiffs that in approximately 1871 the Frl. NE¼ of Sec-

tion 23 was destroyed by an avulsion, or by what they term the "avultive action" of the Arkansas River, in such a manner that it never lost its identity, and that subsequently it was restored. They contend further that in approximately 1900 a "second avulsion" of the river took place which restored it to the old bed which it had occupied prior to 1871, and that thereafter accretions were built to the "restored" Northeast Quarter of Section 23, and that the area in controversy represents this "restored" fractional quarter section plus its accretions; and they claim title thereto.

The defendant, on the other hand, claims that the area in controversy is a true accretion to Spanish Grant No. 2363 which, according to the original Government survey, was located in Arkansas County, Arkansas, on the left descending bank of the river. It says that these accretions to the Grant were separated from the north bank of the river shortly prior to 1900 by the so-called "Quandt Island Avulsion". Defendant contends that the NE¼ of Section 23 was not destroyed by any avulsion or "avultive action" of the river, but was gradually eroded away, completely lost its identity, and has never been restored. It denies that the claim of the plaintiffs has any merit, and asserts title in itself under a chain of title substantially as follows:

Sometime in the 1870's, one Quertermous obtained a tax title from the State to Spanish Grant No. 2363, and in 1890 he conveyed this Grant to Fritz Quandt. In 1909 Quandt conveyed to Wineman, one of defendant's predecessors in title, all of the accretions to the Grant lying South of the Arkansas River, and defendant has obtained this title by mesne conveyances. The 1909 conveyance from Quandt to Wineman occurred subsequent to the Quandt Island Avulsion which separated the area in controversy from the Grant. In 1931, the area was surveyed by the County Surveyor of Arkansas County and was placed on the tax books of that County as Lot No. 3, Spanish Grant No. 2363; defendant's predecessors paid taxes in Arkansas County on that description each and every year from 1931 to 1938, inclusive, more than seven years.

Neither plaintiffs nor defendant have been able to establish actual possession of the area for the statutory period of time, and both sides rely upon constructive possession based upon tax payments under color of title for more than seven years. 3 Ark. Stats. 1947, 37–102. There is no question that the land is wild, unimproved, and unenclosed.

The voluminous record before us discloses that the keystone of the plaintiffs' case is their contention that the NE¼ of Section 23 was destroyed by what they call the "avultive action" of the river in such a manner that it did not lose its identity, and that it has been subsequently restored. As stated, we have come to the conclusion that they have failed to meet the burden imposed upon them in connection with this theory, and that the evidence preponderates in favor of the theory of the defendant.

In support of their respective contentions as to the movements of the Arkansas River between 1839 and approximately 1900, and the consequences thereof, the plaintiffs and the defendant rely largely upon the testimony of experts and their interpretation of certain maps and accompanying data. As a matter of fact, plaintiffs' case is based almost entirely upon the testimony of Mr. St. George Richardson of Memphis, a recognized expert on the Arkansas River. The defendant's expert witnesses were General Max C. Tyler and Major Austin B. Smith, both of the Corps of Engineers of the United States Army.

All three of these experts are men of competence and integrity, and their considered opinions are entitled to great weight. There were, however, sharp divergencies between them. These divergencies were, in our opinion, largely caused by the very nature of the problem before them, the solution of which must necessarily depend upon interpretations of natural phenomena occurring many years ago, upon which interpretations learned men may well differ, and by the fact that these witnesses were compelled to rely in large measure upon maps which were wide apart in point of time, and which were vague as to certain details.

Mr. Richardson at first evolved a theory highly favorable to the plaintiffs, which, had he been able to sustain it, might well have resulted in a decree in their favor. We do not discuss the details of this theory, however, because Mr. Richardson was compelled to expressly abandon it in the light of information he received after its formulation.[2] He made his retraction with the honesty and candor which are characteristic of him. Having done so he proceeded to evolve a substitute theory upon which plaintiffs now rely.

According to this second theory, the NE¼ of Section 23 was entirely destroyed by an avulsion in approximately 1871, but was thereafter restored, not ever having lost its identity, and his idea is that the area in controversy represents the restored Fractional NE¼ of Section 23 together with subsequent accretions thereto. He does not think that the area represents accretions to the Spanish Grant.

General Tyler and Major Smith, on the the other hand, are of the opinion that the NE¼ of Section 23 was not destroyed by an avulsion, but was eroded away by the river in pursuing its customary course of bank caving; they state that in their opinion this parcel of land completely lost its identity as the result of erosion and has never been restored. They take the view that the "avulsion" of approximately 1871 consisted in the river's adopting the bed of Madam Josey's Lake as its new channel, but that the bank changes which thereafter took place were the result of typical erosion. In this connection, both General Tyler and Major Smith expressed the opinion that the river eroded into the East end of the Lake before it entered the West end thereof, and that after eroding into the East end of the Lake it began to erode the NE¼ of Sec-

tion 23, and that by the time the river entered the West end of the Lake, a considerable portion of this parcel of land was already gone. We accept their theory on this point.

To hold in accordance with the theory of the plaintiffs that the NE¼ of Section 23 was destroyed by an avulsion or by so called "avultive action" would require us to reject the testimony of both General Tyler and Major Smith and to accept the substituted theory of Mr. Richardson. This we cannot do. Moreover, the defendant's theory as to how the land came to be destroyed appeals to us as being more probable and more reasonable than that of Mr. Richardson.

In connection with this phase of the case we take it that when the plaintiffs contend that the NE¼ of Section 23 was destroyed by "avultive action", they mean that the caving off of this parcel of land was rapid and perceptible, and that, therefore, the land did not lose its identity, and consequently their predecessors did not lose their title thereto; that on the authority of Wallace v. Driver, 61 Ark. 429, 33 S.W. 641, 31 L.R.A. 317, if land caved rapidly into the river and the process was discernible, the loss was caused by "avultive action", and the owner of the land did not lose his title. Certain language in the nature of dicta in that decision lends some color to such a contention. The language is as follows:

"In Cox v. Arnold, [129 Mo. 337], 31 S.W. 592 [50 Am.St.Rep. 450] * * * Justice Burgess, in delivering the opinion of the court said: 'It is well settled in this state, by an unbroken line of decisions that a riparian proprietor on a navigable stream only owns to the water's edge * * * When a riparian owner becomes the owner of land, he acquires as incident thereto,

2. In propounding his orginal theory Mr. Richardson relied for his information as to channel changes between 1839 and 1884 largely upon the original Government Survey of 1839 and the so-called "Taber Map" of 1884–85. He thought at the time that these were the only maps covering that period. After he had concluded his testimony, in which he set forth his first theory, the defendant introduced in evidence as exhibits to the testimony of one of its experts, Major Austin B. Smith, the so-called "Tackitt Map" of 1872 and the so-called "Sickles Map" of 1874. Mr. Richardson had not known of the existence of either of these maps at the time he gave his original testimony. After studying them he conceded that his original theory could not be sustained.

without price, whatever may be added to it by the gradual and imperceptible accretion, while, at the same time, he assumes the risk of losing it all by its being gradually washed away by the waters of the river; but his line always remains at the water's edge, wherever that may be. The line expands as the waters recede and accretions form to his land, and contracts as the waters encroach upon and wash away his land * * *

" * * * The reverse of what has been said of accretions and erosions is true of avulsions. Where a stream which forms a boundary line of lands from any cause suddenly abandons its old, and seeks a new, bed, or suddenly and perceptibly washes away its banks, such change of channel or banks (if its limits can be determined) works no change of boundary. The owner still holds his title to the submerged land. If an island or dry land afterwards forms upon it, the same belongs to him. City of St. Louis v. Rutz, 138 U.S. 226, 11 S.Ct. 337 [34 L.Ed. 941], Gould, Waters (2d Ed.) §§ 158, 159 and cases cited." (61 Ark. at pages 435–436, 33 S.W. at page 643.)

There are two answers to this argument. In the first place, the plaintiffs have not proved by a preponderance of the evidence that the destruction of the NE¼ of Sec. 23 was particularly rapid. There is no positive evidence in the record as to the actual rate of speed at which the destruction progressed. While Major Smith described the river's progress southward after it entered the western end of Madam Josey's Lake as being rapid, General Tyler testified that the erosion was gradual and went on over a considerable period of time. It is also to be borne in mind, as we have said heretofore, that the river entered the eastern end of the lake first, and a comparison of Major Smith's Exhibit "I" with his Exhibit "J" indicates that a considerable portion of the NE¼ was gone when the river entered the Lake. We cannot say that the washing away of the south bank of the stream, either before or after the river entered the western end of the lake, can be distinguished from the customary bank caving which is to be observed at practical-

ly all periods of high water not only on the Arkansas River but also on the Mississippi, the Red, and the Missouri. Secondly, the observations of the Arkansas Supreme Court in Wallace v. Driver, supra, as to avulsions and the rapid washing away of banks were materially modified in the later case of Yutterman v. Grier, 112 Ark. 366, 166 S.W. 749. The Court, in that case, after referring to the holding in Wallace v. Driver, said:

" * * * it is not literally correct to say the rule of accretion does not apply if any part of the process is perceptible. For instance, the change of the bed of river takes place by attrition, causing the caving of the banks on one side and by accretion, the act of deposit, on the other side, or elsewhere along the stream. Therefore the fact that the caving of the banks on one side is observable at any given time does not prevent the formation on the other side of the river from being an accretion which gives title to the land to the riparian owner. This point is emphasized by Mr. Justice Brewer in delivering the opinion of the Supreme Court of the United States in State of Nebraska v. State of Iowa, 143 U.S. 359, 12 S.Ct. 396, 36 L.Ed. 186, in the following language:

" 'The accretion, whatever may be the fact in respect to the diminution, is always gradual and by the imperceptible deposit of floating particles of earth. There is, except in such cases of avulsion as may be noticed hereafter, in all matters of increase of bank, always a gradual and imperceptible process. There is no heaping up at an instant, and while the eyes rests upon the stream, of acres or rods on the forming side of the river. No engineering skill is sufficient to say where the earth in the bank washed away and disintegrating into the river finds its rest and abiding place. The falling bank has passed into the floating mass of earth and water, and the particles of earth may rest one or fifty miles below, and upon either shore. There is, no matter how rapid the process of subtraction or addition, no detachment of earth from the one side and deposit of the same upon the other. The only thing which distinguishes this river (the Missouri) from other streams, in the

matter of accretion, is in the rapidity of the change caused by velocity of the current; and this in itself, in the very nature of things, works no change in the principle underlying the rule of law in respect hereto.'

"The Supreme Court of Missouri * * * had this to say on the subject, which we think is an important and correct statement of the law: 'The term "avulsion" on the one hand, and "gradual and imperceptible accretion" on the other, are used by writers on alluvion to contradistinguish a sudden disruption of a piece of ground from one man's land to another's, which may be followed and identified, from that increment which slowly or rapidly results from floods, but which is utterly beyond the power of identification. * * *' Benson v. Morrow, 61 Mo. 345.

"The Supreme Court of Iowa in the case of Coulthard v. Stevens, 84 Iowa, 241, 50 N.W. 983, 35 Am.St.Rep. 304, quoted the Missouri court with approval and adopted the same rule.

"The Supreme Court of Illinois in Bellefontaine Imp. Co. v. Niedringhause, 181 Ill. 426, 55 N.E. 184, 72 Am.St.Rep. 269 (quoting from the syllabus) said: 'Where a considerable tract of land is, by the violence of a stream, and in consequence of its cutting a new channel, separated from one tract of land and joined to another, but in such a manner that it can still be identified, the ownership of such separated tract remains unchanged; but when the change is gradual and imperceptible, except by comparisons made at different points of time, the boundary of the deprived riparian owner remains and follows the thread of the stream.'

"The Supreme Court of Missouri, in a recent case followed the rule established in the former case we have quoted from, and emphasized, as in the former case, the test of identity of the new-made land, rather than the length of time in which it was formed. The Court said:

" 'In determining whether a riparian owner has title to land in controversy by accretion, the length of time in which it is in course of formation is not of importance. If it is formed by a gradual, imperceptible deposit of alluvion, it is accretion, but, if the stream changes its course suddenly, and in such manner as not to destroy the integrity of the land in controversy and so that the land can be identified, it is not accretion, and the boundary line remains as before the change of the channel.' McCormack v. Miller, 239 Mo. 463, 144 S.W. 101.

"Tested by these rules we are clearly of the opinion that the land involved in this controversy was accretion and that the material facts in relation to the formation of the land are undisputed.

"If it be conceded that the land was formed during the overflow of one season and that the caving of the bank on the east side of the river was perceptible at times, the process of accretion on the west bank was gradual and imperceptible within the meaning of the law, which cast the title upon the riparian owner." (112 Ark. at pages 371–73, 166 S.W. 749, 751)

■ It seems from this decision that the mere fact that the erosion into the river of the Frl. NE¼ of Section 23 may have been rapid and visible does not change the erosive process into an avulsion. There is no question here that the area in controversy built up by the gradual deposit of silt and sediment over a long period of time; the land which now makes up the area certainly cannot be identified with the land which caved into the river from the South bank. It is interesting to note in this connection that Mr. Richardson's first theory, which he was compelled to abandon, described a true avulsion; under this theory he had the NE¼ of Section 23 not destroyed but simply placed on the North bank of the river by a channel change. What actually happened, however, was that the NE¼ gradually caved into the river, and the earth which comprised it became part of the general mass of "earth and water" floating downstream, never to reappear in any identifiable form. As this process went on, and for a long period after the NE¼ was completely gone, the area on the North Bank of the river built up by a

process of gradual accretion, and the source of the silt with which it was built is unknown to any man. In no sense was the Frl. NE¼ of Section 23 "disrupted from one man's land to another's" so that it could "be followed and identified." Benson v. Morrow, supra.

■ It may, perhaps, be said that the erosion of the Frl. NE¼ of Section 23 was "caused" by the avulsion of approximately 1871 in the sense that except for the action of the river in adopting the bed of the Lake as its new channel this parcel of land would not have been eroded away. Such an argument, however, is of no benefit to the plaintiffs for two reasons: First, as we have heretofore pointed out, erosion of the Frl. NE¼ of Section 23 had already begun and had proceeded to some considerable extent prior to the river's adoption of its new channel, and even had the river delayed taking its new course beyond 1871, this parcel of land would doubtless have been destroyed by a continuation of the erosion which had already set in and which would in all probability have continued. Second, the mere fact that the Frl. NE¼ of Section 23 was made more subject to erosion by the change of course on the part of the river would not change the legal effect of the erosion. It may be said that a channel change in a location upstream may have considerable effect upon the downstream channel and upon the banks on both sides of that channel for an indeterminate distance; these downstream effects, however, would still be erosion and accretion although the original cause therefor might be an avulsion upstream.

Having decided that the NE¼ of Section 23 was destroyed by erosion, completely lost its identity, and has never been restored, we now turn to the affirmative question of whether or not the area in controversy represents accretions to the Spanish Grant. Major Smith testified for the defendant that the area is such an accretion; Mr. Richardson said it was not, and General Tyler was unable to express a definite opinion on the matter.

■ If we were called upon to decide this question upon expert testimony alone, we might not feel justified in holding that the evidence preponderated in the defendant's favor as to the true origin of the area. We are not required, however, to rely wholly on expert testimony for we have the benefit of lay testimony, including surveys made by local surveyors, all of which, when taken in connection with the testimony of Major Smith, has led us to make a factual finding that Quandt Island is a true accretion to the Grant.

■ This lay testimony establishes that prior to the Quandt Island Avulsion, which appears to have occurred shortly before 1900, the area in controversy was solidly connected to the mainland portion of the Spanish Grant, and that one could walk from the area northeastwardly to Arkansas Post without crossing any water or any discernible channel until Post Bayou, which was immediately adjacent to Arkansas Post, was reached. In 1900, Fritz Quandt was clearly claiming this area as an island accretion to the Grant; he had it surveyed by Maxwell who designated it as an island accretion to the Grant, and Quandt at the time of the Maxwell Survey had tenants on the island, had erected improvements upon it, and had a portion of it in cultivation. In 1914, another survey of the area was conducted by H. G. Martin, whose integrity and ability are vouched for by St. George Richardson himself, and he denominated the area as accretion to the Grant. It is interesting to note in connection with the Martin Survey that a controversy had arisen between the Winemans, who then had color of title to the area, and the corporate predecessor of Chicago Mill and Lumber Co., and that Mr. Martin was employed as an impartial surveyor to run out the lines of the contending parties. He made his survey and in connection therewith painted on the trees the "red painted" line which has figured so largely in the testimony in this case and which marks the western and southern limits of the area. His survey was accepted without question by his employers. After 1914, the Winemans placed a timber guard on the property, and he stayed there for some time, the precise period of his occupancy not being shown by the record. The lay testimony to the effect that one

could proceed on dry land from the accretions to the mainland of the Grant, together with the fact that it was obviously the opinion of people living in the vicinity at the time, including experienced surveyors, that the area was in fact an accretion to the Grant, is not without weighty significance here. This testimony and the local reputation of ownership of the area furnish substantial corroboration to Major Smith's theory.

The fact that there may have been a lowland area between the old high bank of the Grant and the body of the accretions, across which water flowed during high stages of the river, as shown by the Taber Map of 1884, would not prevent this area from being an accretion to the Grant. Crow v. Johnston, 209 Ark. 1053, 1057–1058, 194 S.W.2d 193. In this connection, it will be recalled that General Tyler nowhere says definitely that the area is not accretion to the Grant. He is simply not willing to say affirmatively that it was.

Plaintiffs argue that the area in controversy cannot be considered as an accretion to the Grant because upon the happening of the "avulsion" of 1871 the boundary became fixed in the middle of the old channel, and that a subsequent filling up of the old bed would simply be the "ultimate effect of the avulsion" and not an accretion. In support of this argument they cited the decision of the Supreme Court of the United States in the case of State of Arkansas v. State of Tennessee, 246 U.S. 158, 38 S.Ct. 301, 62 L.Ed. 638, L.R.A. 1918D, 258; the validity of the rule referred to by the plaintiffs can not be questioned as an abstract proposition of law. The facts in State of Arkansas v. State of Tennessee,

however, were entirely different from the facts in the instant case, and the rule there mentioned has no application here.

In State of Arkansas v. State of Tennessee the problem was one of true avulsion. At one time the Mississippi River ran around a great bend which was in Arkansas. In 1876 the River cut across the neck of this bend and formed what is known as the "Centennial Cut-Off," and what had theretofore been a bend became an island lying on the East side of the main channel of the river. The old channel became a lake and eventually dried up. The Court held that Arkansas remained the owner of the territory within the original bend, and that the boundary between the two states remained at the same geographical location that the "thalweg of the stream" had occupied prior to the cut-off, and that the subsequent drying up of the old channel did not work any change in boundary and should not be considered as accretion to either of the original shores.

In the instant case the portion of the Frl. NE¼ of Section 23 which was in existence when the river entered the western end of Madam Josey's Lake lay to the South of the new channel which the river adopted. It did not lie to the North of that channel as Dean's Island lay to the East of the new channel of the Mississippi in the case of State of Arkansas v. State of Tennessee. Lying to the South of the new channel this portion of the Frl. NE¼ of Section 23 was made subject to the further erosive action of the river in a southward direction and was eroded away. As this southward erosion continued, the channel of the river receded from its old north bank, building up accretions thereon as it went.[3] There has never

---

**3.** The characteristic action of the Arkansas River in taking away from one and giving to another was strikingly described by the talented Arkansas writer, S. D. Dickinson (as pointed out in Mr. Williamson's brief) in an article on the River published in the June 9, 1946 issue of the Arkansas Gazette, as follows:

"Whimsical, persistent, violent, quiet, the Arkansas swerved back and forth across the alluvial fan. From the rocky

bluffs in the Little Rock area it twisted like a snake held by the tail. It could not rest in its own bed. It was a masculine dance the river performed—a tandava such as the ancient Hindu god Siva danced, revealing perpetual creation and perpetual destruction. * * * The Arkansas never acted niggardly. It gave as lavishly as it took away."

In this connection, we might point out that Judge Woodrough, in Chicago Mill

been in this case a situation where any part of the NE¼ of Section 23 in place was separated from the Spanish Grant by a dead lake which later dried up. Again we may observe that had Mr. Richardson's first theory been correct, · we might have had such a situation, but we do not have it under the facts as actually developed.

■ In view of our holding as to the method in which the NE¼ of Section 23 was destroyed and as to the origin of the area in controversy, the case falls squarely within the holding of the Court of Appeals for this Circuit in Anderson-Tully Co. v. Chicago Mill & Lumber Co., 175 F.2d 735, and the tax payments of the plaintiffs and their predecessors in title in Desha County under the description "Frl. NE¼ of Sec. 23, Township 8 South, Range 3 West, South of Arkansas River, 54.36 acres" for more than seven years avail them nothing. As was said in the case last cited, "The description ceased to identify any land in place which was subject to individual ownership or use. As the new land was thereafter formed by the accretions and was added to the riparian ownership, (in this case to Spanish Grant No. 2363) the description of the riparian land included the accretion and as the Arkansas Court put it, 'All original lines (implied in the old original description) ceased to exist.' Wallace v. Driver, 61 Ark. 429, 433, 33 S.W. 641, 642, 31 L.R.A. 317. In that situation this court held, in Chicago Mill & Lumber Co. v. Tully, 8 Cir., 130 F.2d 268, that in paying taxes on an obsolete description * * * which had ceased to define land in place subject to private ownership and use did not deprive the riparian owner of the accretions to his riparian land." 175 F.2d at page 738. Plaintiffs concede in their brief that if we should find the facts as we have found them, the case last cited would be applicable. Applying this case, as we must, the plaintiffs cannot prevail.

■ The decision we have reached on the method of the destruction of the Frl. NE¼ of Section 23 and the origin of the area in controversy renders it unnecessary for us to decide whether at this time Quandt Island is in Desha County.[4] Of course if the land is not now and never has been in Desha County tax payments in that County by the plaintiffs and their predecessors would not amount to constructive possession of the land. Stout Lumber Co. v. Treadwell, 165 Ark. 138, 263 S.W. 51.

■ We have already outlined the defendant's chain of title to the accretions to the Grant lying south of the river as it ran in 1909 when Quandt conveyed to the Wineman's. As the area was an accretion to the Grant it was at that time in Arkansas County and was not taken out of Arkansas County and placed in Desha County by the "Quandt Island Avulsion". It was subject to taxation in Arkansas County, and defendant's predecessors in title paid taxes thereon under color of title for more than seven (7) years. These tax payments vested title in defendant's predecessors, which it is now entitled to have quieted and confirmed against all claims of the plaintiffs.

A decree in accordance herewith will be entered.

& Lumber Company v. Anderson-Tulley, 8 Cir., 130 F.2d 268, 269, characterized the Mississippi River as writhing "like an imprisoned snake throughout its alluvial valley in its futile effort to establish equilibrium".

4. In 1939, litigation between the Wineman interests and the Chicago Mill & Lumber Company resulted in a consent decree of the United States District Court for the Eastern District of Arkansas, which recited, among other things, that lands including the area in controversy here were located in Desha County. After this consent decree was · rendered, Lot 3, Spanish Grant No. 2363 was removed from the tax books of Arkansas County, and since that time no taxes on this land have been paid in Arkansas County. As stated, the conclusion we have reached renders it unnecessary to pass upon the effect, if any, of said decree on the issues before us.